Filed 4/1/22 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re the Marriage of KIM and MARK S. ZUCKER. | B281051 (Cons. w B284981) |
| KIM ZUCKER, | (Los Angeles County Super. Ct. No. BD 546573) |
| Appellant, | |
| v. | ORDER MODIFYING OPINION (CHANGE IN JUDGMENT) |
| MARK S. ZUCKER, | |
| Respondent. | |

THE COURT:*

The opinion filed March 3, 2022, in the above-entitled matter is ordered MODIFIED as follows:

On page 56, in the first full paragraph, the two references to "child support" are changed to "spousal support."

On page 61, delete the last three full paragraphs and replace them with the following:

After entering a fee order on March 17, 2017, the court's amended fee order, dated May 10, 2017, superseded that order in certain respects and found that "[u]sing $3,539,469 as the fees and expert costs incurred by [Mark] and $3,706,672 as the fees and costs incurred by [Kim], plus $301,046 for court reporting and privately compensated reference judge fees produces total charges incurred by both sides of $7,547,637. Using a 70% share of the total fees to [Mark] as a starting point produces a fee and cost responsibility

of $5,283,346.  Considering the payment of his own fees, his payments to ARC, his payments to US Legal and the advance of $923,383 for fees and costs to [Kim] means that [Mark] has already paid $4,764,258 of the total fees and costs leaving a balance of $519,088 to reach the 70% amount.  This would be the starting point for further contribution of fees to [Kim].

"With a further payment of $1,200,000 [Mark's] total payments would constitute just under 80% of the total fees and costs leaving [Kim] with a responsibility for slightly over 20%. . . . [¶] Based on all of the above the court orders an additional contribution by [Mark] to [Kim's] fees and costs in the sum of $1,200,000, minus a $10,000 reduction representing [Mark's] fees incurred unreasonably as set forth above, estimated fees of [Kim] incurred on the same issue and fees caused by unreasonable delay as set forth above. The net sum is $1,990,000." This latter figure, resulting from an error of arithmetic, was later corrected on May 30, 2017 to $1,190,000.

On page 69, the paragraph under subheading 2 is deleted and replaced with the following:

Relying on the March 17, 2017 fee order, Mark contends the trial court's arithmetic regarding the fee award was in error because the total amount of $5,250,000 minus $4,820,000 is $430,000, not $480,000. Mark's argument is based upon a prior and superseded version of the fee order that was later modified as set forth *ante*. We therefore reject his argument.

On page 72, the disposition is changed to remove the second full sentence beginning with the words "The attorney fee award is corrected."

These modifications change the judgment.
The petitions for rehearing are DENIED.

WILLHITE, Acting P.J.            COLLINS, J.            CURREY, J.

2

Filed 3/3/22 (unmodified opinion)
**CERTIFIED FOR PARTIAL PUBLICATION\*\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re the Marriage of KIM and MARK S. ZUCKER. | B281051 (Cons. w B284981) |
| KIM ZUCKER, | (Los Angeles County Super. Ct. No. BD 546573) |
| Appellant, | |
| v. | |
| MARK S. ZUCKER, | |
| Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Robert Alan Schnider, Judge\*. Reversed and remanded in part, affirmed in part.

Law Offices of Robert M. Cohen, James L. Keane, Yvonne T. Simon and Robert M. Cohen for Appellant.

Kibre & Horwitz , Joseph Kibre; Greines, Martin, Stein & Richland and Marc J. Poster for Respondent.

---

\*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts PHASE I (VALIDITY OF THE PMA) page 3 through page 19, and PHASE II SUPPORT ISSUES, page 37 through page 72.

\*Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

In this contested marital dissolution proceeding, the trial court held a bifurcated, two-phase trial which considered (1) the validity of Kim and Mark Zucker's 1994 premarital agreement (PMA) limiting community property rights and spousal support (phase 1), and (2) determining the awards of child support, spousal support, and attorney fees (phase 2). The case was intensively litigated; the two phases of the trial consumed 57 days. Both Mark and Kim appeal and cross-appeal.[1] They raise a myriad of issues challenging many aspects of the trial court's rulings.

In Kim's appeal, Kim challenges aspects of the trial court's rulings upholding the community property provisions of the PMA and the court's awards of spousal and child support. In Mark's appeal, Mark challenges the trial court's finding that the provision in the PMA limiting spousal support was unconscionable at the time of enforcement. In their respective cross-appeals, Mark and Kim each challenge aspects of the trial court's attorney fee award.

We reject all challenges to the trial court's rulings, except: (1) we correct an arithmetical error in the trial court's attorney fee award, and modify the order to direct Mark to pay Kim $870,000; and, (2) vacate the trial court's ruling on Kim's request for order of March 14, 2014 seeking to modify the temporary spousal support order, and remand for the trial court to determine the amount of pendente lite spousal support from the date of Kim's request. In all other respects, we affirm.

In the published portion of this opinion, we hold that in considering whether a spousal support agreement executed between 1986 and 2002 is enforceable, the court is not limited to a determination under Family Code section 1615, subdivision (a)(2) whether the agreement was unconscionable when executed. Rather, the court retains the power under Family Code section 1612, subdivision (a)(7) to shape public policy regarding premarital

---

[1]     The two separate appeals (each with cross-appeals) were consolidated March 16, 2018 under case No. B281051. We refer to Mark and Kim by first names for ease of reference, and no disrespect is intended.

2

spousal support agreements to the extent not inconsistent with Legislative declarations of such policy, and to declare that a premarital spousal support agreement is unenforceable as against public policy solely because it is unconscionable at the time of enforcement.

## PHASE I (VALIDITY OF THE PMA)
## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The parties met sometime in 1993, when Mark was 33 years old, and Kim was 29. Kim became pregnant in June 1993 and at Mark's request had an abortion. After Kim became pregnant again in late 1993, Mark told her to terminate the pregnancy, but she refused to do so. Thereafter, in early January 1994, the parties discussed marriage.

Mark's attorney prepared the PMA, and on January 28, 1994, the parties signed it. Kim and Mark were married on February 6, 1994. During their marriage, they had six children.[2] They separated on February 21, 2011, and Mark filed a petition for dissolution on June 17, 2011.

At trial, Kim contended that due to her emotional health issues she did not voluntarily enter the PMA and that its spousal support provisions were unconscionable. (Fam. Code, §§ 1612, 1615.)[3]

### A. *Parties' Backgrounds*

The parties had disparate economic backgrounds. Mark is the co-founder and co-CEO of a hedge fund, Dorchester Capital Partners, and founder and co-CEO of the Dorchester Capital Secondaries series of funds. At the time he met Kim, Mark was a bond broker with Libra Investments. Mark had a net worth of about $10 million and made about $2 million a year.

Kim had a history of psychological troubles. When she was 12, her parents divorced. Kim developed an eating disorder (anorexia), for which she was hospitalized. She attended and graduated from a public high school. After attending UCSD for part of a year, she variously took classes at UCLA

---

[2] Allyson (born 1994), Rachel (born 1996), Samantha (born 1997), Eliezer (born 1998), Grace (born 2001), and Jonathan (born 2005).

[3] All statutory references herein are to the Family Code.

3

Extension, Parsons School of Design in New York, and she also attended cooking school, working as a nutritionist.

In 1988, after leaving UCSD, Kim admitted herself to the Westwood Psychiatric Hospital for treatment of her eating disorder. After stealing a prescription pad and obtaining medication with it, she was transferred to a locked ward where she was raped at knifepoint.

In 1989, Kim married Ronaldo Rossi, whom she had met in a 12-step program.[4] Kim's father arranged the couple's PMA, which they executed the day before their marriage. Kim claimed she did not fully understand the effect of the PMA she had made with Rossi. The marriage was dissolved in July 1992.

According to Mark, he was unaware of Kim's past mental health struggles. Kim did not tell Mark that when she was about 14 years old, she was hospitalized for anorexia. Mark was not aware she had only attended one year of college, or that she had been sexually assaulted while at the psychiatric hospital in Westwood. Mark and Kim did not have any discussions about how the rape affected her emotionally.

Mark knew that although Kim was working, she was being supported by her mother. Mark did not know that she was receiving social security benefits at the time of their PMA. He learned this fact after they were married a year when they were preparing their taxes. He also found out during their dissolution proceedings that Kim had a prenuptial agreement in her previous marriage.

Mark observed that in contrast to her claimed issues, during the marriage Kim kept her own bank accounts and did her own shopping. Further, Kim helped supervise the 1995 remodel of the Malibu home Mark purchased and Mark believed she capably performed this task. However, Kim disputed Mark's contention, noting that the construction project manager observed that Mark solely made all decisions regarding the construction.

---

[4] Kim had an abortion, for medical reasons, during her marriage to Rossi.

Kim was the beneficiary of a trust her father set up. Her mother was a trustee and could release the funds to Kim if she wanted to, but she chose not to do so because she believed Kim was incapable of handling the money.

B. *Terms of the PMA*

The PMA contained terms that were very unfavorable to Kim. Kim waived her community property interest; would receive a one-time payment of $10,000 upon moving out of the house; would receive limited spousal support of $6,000 per month, with modest increases; and waived any inheritance rights which would arise from Mark's death during the marriage. The PMA set forth Kim's net worth as approximately $242,000 and Mark's as approximately $5.8 million.

The PMA contained a recital of facts, including that both Kim and Mark had their own separate and independent counsel advising them of their rights under the PMA. The PMA stated that the parties voluntarily and expressly waived their rights to disclosure of assets, property, income, and expenses. They "each acknowledge[d]" being advised of their rights by counsel and adequately understanding such rights. The PMA declared: "Both Kimberly and Mark have each given this Agreement a great deal of thought and each of them acknowledges discussing all of his or her questions with his or her counsel and receiving and understanding answers from his or her counsel to all such questions."

C. *Kim's Pregnancies, Discussions about the PMA, and Marriage*

In June 1993, after Kim became pregnant the first time, she and Mark spoke about getting married. Mark spoke to Kim about the "general outlines" of the PMA in June "before she had her first abortion." They had between five and 10 conversations about Mark's net worth. He told her he was worth about $10 million to signal to her that he was worried about getting married without a prenuptial agreement.

When Kim told Mark she was pregnant the second time, he told her to have an abortion. They discussed alternatives to marriage, including that Kim would have the baby and they would not get married, or that Kim would have an abortion or put the baby up for adoption. Ultimately, Kim believed

5

her options were to marry Mark with a PMA, to have an abortion, to have the baby and put the child up for adoption, or to raise the child as a single mother.

Kim scheduled an abortion for January 4, 1994, although she did not go through with it. At the time, Kim's doctor noted that she was "distraught." Kim's mother also observed Kim was upset during the time before the wedding and after she signed the PMA. After she did not have the abortion, Kim's family told her they would not help her financially with the baby. Contrary to Kim's mother's observations, Mark's rabbi and friends observed that during the period before the PMA and during the parties' marriage, Kim seemed rational and was happy to be getting married.

About a week after Kim told Mark she did not go through with the abortion, they began to discuss marriage. Mark told her that he would not marry her without a PMA. Mark specified two options if she did not have an abortion. Kim could sign the PMA and Mark would consider, but not commit to, marriage, or Kim could have the baby on her own and Mark would financially support the child

Kim and Mark obtained a marriage license on January 11, 1994. Kim picked out a wedding dress, had fittings, and the parties bought a ring. They met with Mark's Rabbi and Mark's mother. The wedding on February 6, 1994 was small (about 20 or 30 people) and held at Mark's parents' apartment.

D.    *The Drafting and Signing of the PMA, January 28, 1994*
      1.    *Drafting of the PMA*

From late December 1993 to mid-January 1994, before they married, the parties had specific discussions concerning the provisions in the PMA. The PMA went through several drafts. According to Mark, a PMA was Kim's idea, and she asked for the "toughest prenup possible."

Around this time, Mark earned about $25,000 per month. He made about $400,000 in bonus at the time as well, bringing his income to about $2 million per year. They also discussed that Kim would get $10,000 "to move out of the house." Kim stated that if the marriage did not work out, Mark would get the house. In spite of Mark's recollections, Kim testified they had no discussions concerning the terms of the PMA.

6

According to Mark, they discussed alternative terms to include in the PMA. In particular, they discussed the support amount and decided on a figure of $6,000. They also discussed how long the marriage must last before support would be paid, and how long spousal support would be paid. They made changes to the spousal support provisions after he discussed them with Kim. Initially, Kim was not going to get spousal support. Although Kim had asked him for the "toughest prenup possible," Mark told her he wanted some spousal support for her. They started with $6,000 per month and "work[ed] our way backwards from there." They had at least two discussions about spousal support.

The PMA went through several drafts. The PMA was drafted by Mark's attorney Joseph Kibre (Kibre). Mark first received a draft in late December 1993. Mark knew that Kim received a draft in mid-January 1994 because he gave her the draft. After Mark gave Kim the draft in mid-January, they did not discuss the PMA any further. Mark claimed he would not have gotten a marriage license until after the prenup was signed. Kim claimed she saw the PMA for the first time the day she signed it. She did not discuss it with her family. However, according to Mark, Kim generally approved of the PMA but thought she should get her support payment sooner.

2.    *Signing of the PMA*

On January 28, 1994, Kibre sent by messenger a letter to Kim's attorney Sorrell Trope at Trope and Trope advising that Kibre would be out of town the following week, and therefore "Mark would very much like to conclude signing the [PMA] today." Thus, Kibre requested that the PMA be signed by Kim and returned that day. As a result, the same day Kim met with her attorney Donna Beck Weaver (Weaver), also of Trope and Trope, to discuss the PMA, but neither Kim nor Weaver could recall specifics of the actual signing of the PMA.

Weaver gave Kim a letter advising her of the ramifications of the PMA and advising her not to sign it. She wrote: "The purpose of this letter is to confirm the parameters of the advice which we have rendered to you regarding the [PMA] which you intend to enter into with Mark S. Zucker." Specifically, the letter stated that "[w]e have thoroughly discussed with you

7

the operation of California community property law. . . .  [¶] There can be no doubt that by signing the proposed [PMA], you are giving up your right to share in extremely substantial community property income from Mark's employment services during marriage."  In the PMA, Kim also waived her *Pereira* and *Van Camp* rights.[5]  Weaver's letter advised Kim that the "proposed [PMA] <u>substantially limits</u> your ability to seek spousal support from Mark . . . .  You have stated that the foregoing is nevertheless acceptable to you."  Given Mark's income of $2 million a year, Weaver advised that the amount and duration of support "is <u>extremely low</u> with respect to support that would otherwise be ordered."

Weaver further observed that "[a]nother troublesome aspect of the proposed [PMA] is the provision calling for you to vacate [the] family home if you are not the owner of the home upon a separation.  [¶] We have expressed to you our view that such a provision is contrary to California public policy in that the court, absent this [PMA], could allow you to remain in such home at least temporarily."  Instead, the PMA gave Mark the right to oust Kim from the home on short notice.  "During the course of negotiations, you have repeatedly told me that if your relationship with Mark failed, you would not want to remain in the then family residence.  In response, I advised you that although you may well feel that way in the present, there is no way you can foresee how you will feel about the same issue in the future, when you may have children, you may have been out of the work force for some time, and you have a completely different world view and set of needs."

---

[5]     *Pereira v. Pereira* (1909) 156 Cal. 1 (*Pereira*); *Van Camp v. Van Camp* (1921) 53 Cal.App. 17 (*Van Camp*).  California courts use two alternative approaches to allocating business profits from a spouse's separate business developed from these cases.  The *Pereira* approach allocates a fair return to the separate property investment and allocates the balance of the increased value to community property as arising from community efforts.  The *Van Camp* approach determines the reasonable value of the community's services, and allocates that amount to community property and the balance to separate property.  (*In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 852–853.)

8

In conclusion, Weaver advised Kim not to sign the PMA. "We cannot give you any advice about whether or not you should marry Mark. That is clearly a personal choice for you alone to make." Kim signed the letter, acknowledging she had read it and that it was "Agreed, Acknowledged and Understood." Weaver billed a total of four hours for the signing process, noting in her billing records: "Formulate letter to client re [PMA]; conference with client re full explanation of [PMA]; complete property declaration; revisions to [PMA]."

At trial, Weaver testified she did not have any recollection of the legal work done for Kim, or the period January 25 through January 28, 1994. Due to her lack of recollection, Weaver testified to her "custom and practice" regarding the review and signing of a PMA. Her custom and practice was to go through a PMA and ensure the client understood its terms. She would ensure that the client understood what she was saying. At the time, Weaver had done between five and 25 PMAs.

Weaver did not recall having a specific custom and practice whereby when she represented the financially weaker spouse, she would ask whether they had any mental problems. Although Weaver saw red flags in the PMA, she did not recall asking Kim if she had any mental problems, and she did not know that Kim was on social security disability. She had no independent recollection whether Kim understood what Weaver was advising her about the terms of the PMA on January 28.

Weaver believed the attorney certification was usually prepared by the attorney who prepared the PMA. Weaver had no independent recollection of whether Kim read every page of the PMA, but Kim initialed each page.

Kim did not remember the substance of her meeting with Weaver on January 28, 1994 and did not recall for how long they met. Mark told her she had to sign the PMA that day, and Kim repeated her conversation with Weaver, telling Mark that her lawyer said it was not fair. Mark responded that to the contrary, stating it "absolutely" was fair. Kim recalled that "I had two choices, listen to the lawyers [that the PMA was unfair] and go have an abortion, or listen to Mark and have a child that I didn't want to abort."

9

E.    *Trial on the Validity of the PMA*

Trial on the first phase commenced in July 2013.  Kim challenged the PMA on the basis she did not enter it voluntarily because she lacked capacity to appreciate its terms due to her lack of a college education, she was under duress due to her pregnancy, and she lacked family support and financial resources.  Mark asserted that Kim had previously executed a premarital agreement before her previous marriage and understood the effect of such an agreement; she had adequate time to review the PMA, receiving a detailed letter from her attorney; and Kim failed to specify how her "mental illness" affected her ability to sign the PMA.

F.    *Statement of Decision*

On April 21, 2014, the court issued its statement of decision.  On the issue of voluntariness, the court found Kim voluntarily executed the PMA.

*Duress*.  The court found "no evidence whatsoever of duress."  The court noted that "there are certain unique factors" applicable to PMAs in addition to the general contract factors of pressure, threats, or mental coercion.  These factors consisted of proximity of signing to the wedding, surprise in presentation of the agreement, absence of independent counsel, lack of full disclosure, lack of understanding of the rights being waived, and inequality of bargaining power.

The court found no surprise in presentation of the PMA to Kim because she aware of the PMA before any guests were invited to the wedding or wedding plans were finalized.  Kim was represented by highly qualified independent counsel, and she had full disclosure and knowledge of the rights being waived.  The proximity of signing to the wedding was not significant because Kim had "clearly decided to not discuss the issue with any family members, had gotten the advice from her counsel to not sign but told counsel she intended to sign anyway, knew Mark's position that she must sign or he would not marry her and knew she did not wish to accept any other available options.  There is no further action she would have likely taken if there was further delay and no reason to believe any delay would have changed her decision."

*Undue Influence*.  After noting there was no confidential relationship between parties entering into a PMA,[6] the court found no undue influence. Under *Bonds, supra*, 24 Cal.4th at pages 27–30, the court must consider the substantial weakness of the party influenced, the strength of the other party, and pressures to quickly conclude the agreement.  Here, the trial court compared the case to *In re Marriage of Dawley* (1976) 17 Cal.3d 342 (*Dawley*), a factually similar case where the court upheld a PMA even though the wife was unwed and pregnant before the execution of the PMA, noting the wife, like Kim, had her own counsel.  (*Id.* at pp. 354–355.)  Further, as in *In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, Kim had her own counsel and was given a full explanation of the transaction and signed the acknowledgment to the Weaver letter.  (*Id.* at pp. 735–736.)  Although she claimed to have no choice, "[Kim] signed the [PMA] because she wanted to be married to Mark and she knew clearly and for many months that that would not happen without a PMA."

*Competence.*  The trial court found that "Kim's contention that for most of her life she has suffered from serious mental and emotional problems is amply supported by the evidence," but that such problems were not the standard by which competence to contract was measured.  Probate Code sections 810-812 set forth a rebuttable presumption that persons are competent to enter into agreements and set forth the factors for the court to consider in evaluating whether the presumption has been rebutted.  Applying these factors, the trial court found Kim had not rebutted the presumption of competence, highlighting the facts that Kim graduated high school, attended some college, checked herself into the hospital twice (based on eating disorders, rather than a break from reality), and attended classes at UCLA

---

[6]     Parties negotiating a premarital agreement are not presumed to be in a confidential relationship that would give rise to the fiduciary duties owed between spouses under section 721 or to the presumption of undue influence when a transaction benefits one of the parties.  (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 29 (*Bonds*) ["it is evident that the Uniform [Premarital Agreement] Act was intended to *enhance* the enforceability of premarital agreements, a goal that would be undermined by presuming the existence of a confidential or fiduciary relationship"].)

11

extension and Parsons School.  Further, the parties' rabbi, Rabbi May, found Kim to be coherent, rational, never disoriented or depressed.  Similarly, Mark's brother and friends found Kim to be coherent, rational, and happy. Weaver (Kim's counsel regarding the PMA) stated Kim understood the PMA. Moreover, Kim's call to Mark regarding the fairness of the PMA indicated her understanding of it.

## II.  KIM'S APPEAL IN PHASE I

Kim contends that the trial court erred in finding that she entered the PMA voluntarily, thus upholding the limitation on community property. While generally accepting the trial court's findings of fact regarding the signing of the PMA, Kim asserts the trial court applied the wrong legal standard and failed to apply relevant law to the facts.  She also contends that the trial court made evidentiary errors.  We disagree with her contentions.

### A.    *Standard of Review*

In determining the voluntariness of a premarital agreement, the reviewing court accepts such factual determinations of the trial court as are supported by substantial evidence.  (*In re Marriage of Hill & Dittmer* (2011) 202 Cal.App.4th 1046,1051–1052 (*Dittmer*); *Dawley, supra,* 17 Cal.3d at pp. 354–355; *In re Marriage of Alexander* (1989) 212 Cal.App.3d 677, 682 [determination as to extrinsic fraud in connection with a marital settlement agreement is accepted on appeal if supported by substantial evidence]; "'"In reviewing the evidence on . . . appeal all conflicts must be resolved in favor of the [prevailing party], and all legitimate and reasonable inferences indulged in [order] to uphold the [finding] if possible."'"  [Citation.]" (*Bonds, supra,* 24 Cal.4th at p. 31.)

### B.    *Legal Principles*

Parties contemplating marriage may validly contract regarding their property rights in the event of dissolution.  Such a prenuptial agreement may address both property owned at the time of marriage and property and earnings that may be acquired during the marriage.  (*In re Marriage of Hill & Dittmer, supra,* 202 Cal.App.4th at p. 1052.)  Pre-marital agreements and

12

marital settlement agreements are contracts and must comply with general principles of contract law—there must be capacity to contract, valid consent, a lawful object, and proper consideration. (Civ. Code, § 1550.)

The version of the Family Code applicable to the validity and enforcement of premarital agreements turns on the date of execution. (*In re Marriage of Melissa* (2012) 212 Cal.App.4th 598, 611 (*Melissa*).) The Uniform Premarital Agreement Act (UPAA, § 1600 et seq.) controls the enforceability of premarital agreements executed on or after January 1, 1986 (§ 1601). Parts of the UPAA (§§ 1612 and 1615) were significantly amended effective January 1, 2002, and case law has since clarified that sections 1612, subdivision (c) and 1615, subdivision (c)(2) may not be retroactively applied to premarital agreements executed between 1986 and 2002. (See *Melissa, supra*, 212 Cal.App.4th at pp. 610–611.)

Here, we apply the version of section 1615 in effect at the time of execution of the PMA in January 1994, which provided in relevant part that "(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves . . . . [¶] (1) That party did not execute the agreement voluntarily." (Former § 1615, subd. (a).)[7]

Generally, a party who has signed an agreement with the capacity of reading and understanding its contents will be bound by its contents; he or she effectively is estopped from claiming the provisions are contrary to his or

---

[7] Former section 1615, subdivision (a) provided in full: "(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves either of the following: [¶] (1) That party did not execute the agreement voluntarily. [¶] (2) The agreement was unconscionable when it was executed and, before execution of the agreement, all of the following applied to that party: [¶] (A) That party was not provided a fair and reasonable disclosure of the property or financial obligations of the other party. [¶] (B) That party did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided. [¶] (C) That party did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party. [¶] (b) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law." (Stats. 1992, ch. 162, § 10.)

her intentions or understanding. (*Dittmer, supra,* 202 Cal.App.4th at pp. 1054–1055 [wife who failed to take reasonable steps to familiarize herself with premarital agreement's final draft, especially considering her business background, awareness of earlier drafts and access to counsel, was bound by its content].) However, a party seeking to invalidate a PMA may prevail by establishing the agreement was not entered into voluntarily. Lack of capacity, duress, fraud, and undue influence "as demonstrated by a number of factors uniquely probative of coercion in the premarital context, would be relevant in establishing the involuntariness of the agreement." (*Bonds, supra,* 24 Cal.4th at p. 19.) These factors include: the coercion that may arise from the proximity of execution of the agreement to the wedding, or from surprise in the presentation of the agreement; the presence or absence of independent counsel or of an opportunity to consult independent counsel; inequality of bargaining power; whether there was full disclosure of assets; and the parties' understanding of the rights being waived under the agreement or at least their awareness of the intent of the agreement. (*Id.* at p. 18.) However, these factors are not isolated considerations, and the presence or absence of a particular factor is not dispositive. (*Id.* at pp. 23, 37; *Dittmer, supra,* 202 Cal.App.4th at pp. 1052–1053.)

C.    *Analysis*

Substantial evidence supports the trial court's finding Kim entered into the PMA voluntarily under section 1615, subdivision (a). As the trial court found, applying the factors set forth in *Bonds,* there was no coercion based on the proximity of the execution of the PMA to the wedding, which occurred more than a week later and was attended by only a small group in a private residence. Kim was not presented with the PMA on the eve of marriage, and the wedding preparations had been underway for enough time that she was not surprised by PMA. Further, Kim was aware that Mark would not marry her without one, and this requirement for marriage was discussed many months before her second pregnancy. Indeed, Kim stated that she wanted a very tough PMA to show how much she loved Mark.

Kim nonetheless highlights her options if she did not marry—becoming a single mother, obtaining an abortion, and being cut off by her parents—as

14

providing sufficient compulsion for her to agree to a very one-sided PMA. Kim argues that she was a distraught woman being left alone to deal with an unexpected pregnancy and therefore could not have executed such an extremely one-sided PMA as the result of her informed and voluntary choice. Further, she argues her testimony that she was "emotionally very weak [and] frail" and unable to decipher what was going on around her, plus the length of the PMA (48 pages) and its complexity, creates severe doubt whether her execution of the PMA constituted a knowing and informed choice.

While the trial court might have found these circumstances persuasive, it did not, and substantial evidence supports that conclusion. The trial court was entitled to conclude that despite the less than desirable options for Kim, she nonetheless concluded willingly and voluntarily that marriage with a PMA was a better option than no marriage. Any inequality in bargaining power was offset by Mark's promise to support the child if Kim elected to keep the baby.

Further, Kim consulted with independent counsel, Weaver, who provided her with a letter detailing her concerns about the PMA, advised Kim not to sign it, and noted that Kim had decided to disregard the advice. Moreover, the trial court was entitled to rely on Weaver's testimony as to her custom and practice in discussing such agreements with clients to conclude that Weaver had followed such custom with Kim. Weaver explained the import of the PMA, including the waiver of community property rights, waiver of *Pereira* and *Van Camp* rights, and the limited spousal support available. Kim signed the PMA to signify that she understood these terms. In addition, Kim had previously entered into a PMA before her prior marriage and was familiar with the concept and the intent of such agreements, which was to have one party concede community property rights under California law.

Finally, there was sufficient disclosure of assets for Kim to understand that she was waiving substantial potential future community property interests. In short, substantial evidence supports the trial court's conclusion that Kim entered the PMA voluntarily.

D.    *Kim's Evidentiary Arguments*

1.    *Exclusion of Rebuttal Testimony of Miriam Scharf*

(a)    *Factual Background*

Miriam Scharf, a psychotherapist, jointly counseled Kim and Mark starting in late 1994 or early 1995. After initially counseling the couple, Ms. Scharf continued to counsel them for four years "as needed."

At trial, Ms. Scharf's testimony was offered to rebut the testimony of the project manager on the house remodel, Kelly John Nogy, that Kim appeared competent. Kim did not designate Ms. Scharf as an expert. Nonetheless, Scharf testified to Kim's state of mind during the couple's home remodel from 1995 through 1997. Scharf testified that Kim suffered from "dependent personality disorder," a personality disorder which is characterized by a fear of abandonment, inability to make decisions, and a lack of judgment. Such a person defers to others to help them make decisions.

Mark objected to the admission of this evidence. The court permitted Scharf to testify subject to a motion to strike. After receiving the testimony, the court granted Mark's motion to strike, citing *Kalaba v. Gray* (2002) 95 Cal.App.4th 1416 (*Kalaba*). The court excluded Scharf's testimony regarding Kim's alleged personality disorder but admitted Scharf's testimony to the extent it constituted percipient witness observations.

(b)    *Discussion*

Kim argues the court erred in excluding Scharf's testimony diagnosing Kim as having dependent personality disorder, because Scharf was not offering an opinion on ultimate fact issues, such as Kim's capacity to contract, but only testifying as to her observations regarding Kim's state of mind. Further, such evidence was offered only after "Mark opened the door" by offering evidence that Kim competently oversaw the renovations of the Malibu home during the period 1995 to 1997. Finally, she argues there was

16

no surprise to Mark because he could have deposed Scharf during a one-month hiatus in trial dates.[8]  We find no abuse of discretion.

A party must disclose those treating physicians who will testify as an expert.  (*Schreiber v. Estate of Kiser* (1999) 22 Cal.4th 31, 35.)  *Kalaba* explained there are two types of physician experts, retained and nonretained.  Experts must be listed in an expert designation to be permitted to provide expert opinion testimony at trial.  In addition, should the physician testify, an expert witness declaration is required.  (*Kalaba, supra*, 95 Cal.App.4th at p. 1422.)  However, treating physicians are not "retained experts" within the meaning of Code of Civil Procedure section 2034.210, subdivision (b), and no expert declaration is required when a party intends to call a treating physician for the purpose of eliciting expert testimony; it is sufficient if a treating physician is identified by name and address in the proponent's designation of expert witnesses.  (*Id.* at pp. 1422–1423.)

The purpose of the expert designation rule is "'to give fair notice of what an expert will say at trial'" and allows the parties to assess whether to take the expert's deposition, to fully explore the relevant subject area at any such deposition, and to select an expert who can respond with a competing opinion on that subject area.  (*Dozier v. Shapiro* (2011) 199 Cal.App.4th 1509, 1522 (*Dozier*).)  By requiring the parties to provide a summary of each potential expert's anticipated testimony, the expert witness designation procedures provide the parties with the ability to intelligently determine which of the opposing party's potential expert-witness physicians need to be deposed before trial.

In *Kalaba,* the plaintiff informed the court she intended to call three treating physicians who had been identified in her deposition or answers to interrogatories.  The trial court granted defendant's motion to exclude the testimony of these three doctors.  (*Kalaba, supra*, 95 Cal.App.4th at p. 1419.)  "[T]he trial court acts within its discretion when it excludes expert testimony by the non-designated doctors."  (*Id.* at p. 1423.)

---

[8]     At trial, Kim offered to make Ms. Scharf available for deposition, and the court ordered the parties to meet and confer on this issue.  Mark did not depose Ms. Scharf.

Here, the trial court did not abuse its discretion by limiting Ms. Scharf's testimony to percipient observations. Kim failed to designate Ms. Scharf as an expert. (*Kalaba, supra*, 95 Cal.App.4th at p. 1423; *Dozier, supra,* 199 Cal.4th at p. 1524.) Further, under *Kalaba,* the result remains the same even though Kim offered Ms. Scharf as a rebuttal to Mark's testimony regarding the Malibu house remodel. Scharf was an undesignated expert and as such the trial court properly excluded her expert diagnosis of Kim's personality disorder.

2.     *Evidence of Kim's Attorney's Custom and Practice*
(a)     *Weaver's Testimony*

Kim called as a witness at trial her attorney Weaver, who represented Kim in connection with the review and signing of the PMA. As previously noted, Weaver did not have any recollection of the legal work done for Kim, or the period January 25 through January 28, 1994. As a result, Weaver testified to her "custom and practice" regarding the review and signing of a PMA.

(b)     *Discussion*

Kim argues that the court erred in admitting the "custom and practice" testimony of Weaver. According to Kim, Weaver had not previously reviewed a PMA with a client like Kim who was four months pregnant and who had two previous abortions; and there was no evidence Weaver "had developed the ability to discern whether her client actually understood the numerous and complex legal principles which were supposedly being explained."

Evidence Code section 1105 provides: "Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom." "[A] habit involves a consistent, semiautomatic response to a repeated situation." (*Bowen v. Ryan* (2008) 163 Cal.App.4th 916, 926; *Briley v. City of West Covina* (2021) 66 Cal.App.5th 119, 138.) More specifically, "habit" constitutes a person's regular or consistent response to a repeated situation, while "custom" means the routine practice or behavior on the part of a group or organization that is

equivalent to the habit of an individual. (*People v. Johnson* (2019) 8 Cal.5th 475, 518.)

We review the court's evidentiary rulings for abuse of discretion. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) "Specifically, we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*Ibid.*) A miscarriage of justice results only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Kim asserts that there was no evidence Weaver had a "consistent, semiautomatic response" to a repeated situation, namely, the execution of PMAs. Kim's argument is based upon the relatively few instances Weaver had assisted a client with the signing of a PMA and her contention that there was no evidence Weaver had previously counseled someone like Kim who was pregnant and had psychological difficulties. We disagree.

Kim's argument does not undermine the validity of the evidence to support a finding that Weaver behaved in conformity with the law firm's custom in reviewing and signing PMAs on the day Kim signed the PMA. The execution of PMAs, given their nature as an instrument waiving valuable property rights, involves a ritualized signing and affirmation, both to every page of the agreement, and to the contents of the agreement. Further, Weaver's testimony was corroborated by the detailed letter she gave to Kim advising her not to sign the PMA. In short, the trial court did not abuse its discretion in admitting evidence of Weaver's habit and custom.

## III.  MARK'S APPEAL IN PHASE I

Mark contends that the trial court erred by invaliding the spousal support provision of the PMA, which was entered in 1994, as unconscionable based on circumstances existing at the time of enforcement. He raises an issue on which California law is unsettled, an uncertainty created by the timing and intent of an amendment to the Family Code effective 2002 (the addition of subd. (c) to § 1612), and the decisions in *In re Marriage of Pendleton & Fireman* (2000) 24 Cal.4th 39 (*Pendleton*), *In re Marriage of*

*Howell* (2011) 195 Cal.App.4th 1062 (*Howell*), and *In re Marriage of Facter* (2013) 212 Cal.App.4th 967 (*Facter*). Indeed, as noted by a leading treatise, the state of the law is "unclear if a trial court is required to consider whether a spousal support limitation or waiver in a premarital agreement executed between 1986 [the effective date of California's adoption of the Uniform Premarital Agreement Act (UPAA)] and 2002 is unconscionable at the time of enforcement, the time of execution, or both." (Hogoboom, et. al. Cal. Practice Guide: Family Law (Rutter Group 2021), p. 9-78, § 9:177.4; see also *In re Marriage of Miotke* (2019) 35 Cal.App.5th 849, 860–861 (*Miotke*) [noting uncertainty in the law].)

Attempting to provide some clarity, we hold, for reasons explained below, that in considering whether a spousal support agreement executed between 1986 and 2002 is enforceable, the court is not limited to a determination under section 1615, subdivision (a)(2) whether the agreement was unconscionable when executed. Rather, the court retains the power under section 1612, subdivision (a)(7) (identified in *Pendleton, supra,* 24 Cal.4th at pp. 48–49) to shape public policy regarding premarital spousal support agreements to the extent not inconsistent with Legislative declarations of such policy, and to declare (as suggested though left open in *Pendleton, id.* at pp. 53–54) that a premarital spousal support agreement is unenforceable as against public policy solely because it is unconscionable at the time of enforcement.

### A. *Provisions of the PMA Relating to Spousal Support*

Article 13 of the PMA governed spousal support. In Article 13, the parties affirmed that their counsel believed contemporaneous and existing California public policy did not permit premarital agreements limiting spousal support. Nonetheless, "the parties intend and desire to have this Agreement resolve their respective rights and obligations to the fullest extent permissible regarding the support of [Kim] in the event the marriage of the parties terminates by reason of a permanent separation, dissolution or divorce."

Further, the parties agreed that if California law did not recognize limitations on spousal support, Article 13 would be of no force or effect.

20

However, "the parties further agree that if prenuptial agreements regarding spousal support of the nature set forth herein become enforceable under California law, either by reason of a statutory change or by reason of a judicial determination, . . . then the provisions of this Article 13 shall fully apply."

With respect to spousal support, Kim and Mark mutually relinquished "to the full extent permitted by law any and all right, entitlement or award of spousal support." The PMA set forth that Mark agreed to pay Kim temporary and permanent spousal support according to a schedule, based on the number of years of their marriage. If the marriage was less than two years, Mark would pay no spousal support, but payments thereafter would increase as the marriage lengthened, up to $6,000 a month after 11 years. These payments would be adjusted to reflect changes in the CPI.

Finally, the parties agreed that "no court shall have or retain any power or jurisdiction to extend, increase, decrease or otherwise modify the payments of Spousal Support provided in this Article 13 or to require that Mark pay any other amounts as Spousal Support or alimony, regardless of changed circumstances or changes in the law existing at any time." The spousal support provisions were agreed to be severable from the rest of the PMA.

At trial, Kim argued Mark's spousal support obligation of $6,000 per month with a one-time payout of $10,000 was unconscionable at the time of enforcement and therefore unenforceable. Relying on *Facter, supra,* 212 Cal.App.4th 967, Kim's brief highlighted the disparities in the parties' income. Mark had a $32 million net worth, $4 to $5 million yearly income (with a monthly net of between $376,000 to $682,453) while Kim had stayed at home and raised the parties' children during the marriage and had no current employment.

B.    *Trial Court Ruling*

On January 30, 2014, the court issued its statement of tentative decision.[9]  The court recognized that section 1612, subdivision (c) regarding spousal support provisions did not retroactively apply to the spousal support provision of the PMA.[10]  However, relying on *Pendleton, supra,* 24 Cal.4th 39 and *Facter, supra*, 212 Cal.App.4th 967, the court concluded that it had the authority to determine whether the PMA was unconscionable at the time of enforcement.

Examining the circumstances present in *Facter* (in which the Court of Appeal found a premarital waiver of spousal support unconscionable at the time of enforcement), the trial court concluded that "[t]he facts of this case are . . . even more extreme for Kim."  In *Facter,* the wife had a high-school education and was unemployed throughout the 16-year marriage, while the husband had an annual income of $1 million and a net worth of $10 million. Here, Kim's forensic accountant had opined that Kim would need $86,000 per month to meet the marital lifestyle based on an income-available approach, while an expenditure approach would yield $37,000 per month.  The trial court adopted the expenditure approach because there was no community property per the PMA.  Kim, like the wife in *Facter,* was unemployed, similarly educated, and spent the marriage raising the couple's six children. The trial court found the amount Kim would receive under the PMA—

---

[9]    The statement of decision was supplemented on March 11, 2014, and April 21, 2014, to respond to the parties' comments, but did not change the court's ruling on unconscionability.

[10]    That section provides: "(c) Any provision in a premarital agreement regarding spousal support, including, but not limited to, a waiver of it, is not enforceable if the party against whom enforcement of the spousal support provision is sought was not represented by independent counsel at the time the agreement containing the provision was signed, *or if the provision regarding spousal support is unconscionable at the time of enforcement.*  An otherwise unenforceable provision in a premarital agreement regarding spousal support may not become enforceable solely because the party against whom enforcement is sought was represented by independent counsel." (§ 1612, subd. (c), italics added.)

"merely 10% of the probable order without the agreement"—was unconscionable.

## C.    *Discussion*

Mark contends that the trial court did not have the authority to find the spousal support provision of the PMA unenforceable as being unconscionable at the time of enforcement.  We disagree.  Our explanation of our decision requires an examination of the state of the law when the parties entered the PMA and subsequent developments.

### 1. *The Uniform Premarital Agreement Act*

Effective 1986, the Legislature adopted the Uniform Premarital Agreement Act (UPAA), now Family Code section 1600 et seq.[11]  In 1994, when the parties in the present case entered the PMA, section 1612, subdivision (a) provided, as it does now, that "[p]arties to a premarital agreement may contract with respect to all of the following." (Stats. 1992, ch. 162, § 10.)  It listed various specific topics and concluded with "(a)(7) Any other matter, including their personal rights and obligations, *not in violation of public policy* or a statute imposing a criminal penalty." (*Ibid.,* italics added.)[12]

---

[11]    The UPAA was originally enacted as part of the Civil Code, but in 1994 was reenacted as part of the Family Code.

[12]    In its entirety section 1612 provided at the time of the PMA: "(a)  Parties to a premarital agreement may contract with respect to all of the following:  [¶]  (1)  The rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located.  [¶]  (2)  The right to buy, sell, use, transfer, exchange, abandon, lease, consume, expend, assign, create a security interest in, mortgage, encumber, dispose of, or otherwise manage and control property.  [¶]  (3)  The disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event.  [¶]  (4)  The making of a will, trust, or other arrangement to carry out the provisions of the agreement. [¶]  (5)  The ownership rights in and disposition of the death benefit from a life insurance policy.  [¶]  (6)  The choice of law governing the construction of the agreement.  [¶]  (7)  Any other matter, including their personal rights and

23

With respect to the unenforceability of premarital agreements on the ground of unconscionability, section 1615, subdivision (a) provided in relevant part that "[a] premarital agreement is not enforceable if the party against whom enforcement is sought proves either of the following: [¶] . . . [¶] (2) The agreement *was unconscionable when it was executed* and, before execution of the agreement, all of [certain listed conditions] . . applied to that party." (Stats. 1992, ch. 162, § 10, italics added.)

### 2. *Pendleton, supra, 24 Cal.4th 39*

When the UPAA was enacted, California common law disfavored premarital agreements generally (including agreements waiving or limiting spousal support) as being in violation of public policy, namely, as encouraging divorce. (See *Dawley, supra,* 17 Cal.3d at p. 352 ["an antenuptial agreement violates the state policy favoring marriage only insofar as its terms encourage or promote dissolution"].) In 2000, in *Pendleton, supra,* 24 Cal.4th 39, the California Supreme Court was "asked to decide whether a premarital agreement in which the parties to be married waive the right to spousal support in case of dissolution is enforceable." (*Id.* at p. 41.) As noted, section 1612, subdivision (a)(7) then (as now) permitted parties to enter premarital agreements limiting their marital rights if "not in violation of public policy." Observing that "[i]t is not necessary to decide in this case whether all such agreements are enforceable regardless of the circumstances of the parties at the time enforcement is sought," the court "conclude[d] that no policy of this state makes an agreement like that entered into by the parties to this action per se unenforceable." (*Ibid.*) The court's holding rested on two primary lines of analysis: (1) an examination of public policy as defined by the courts regarding premarital spousal support waivers, and (2) whether the UPAA deprived the court of the power to shape that policy after its enactment.

---

obligations, not in violation of public policy or a statute imposing a criminal penalty. [¶] (b) The right of a child to support may not be adversely affected by a premarital agreement." (Stats. 1992, ch. 162, § 10, p. 464, operative Jan. 1, 1994.)

24

As to the first line of inquiry, the court charted the evolution of its prior decisions regarding the unenforceability of premarital agreements and concluded that when "the California version of the Uniform Act was adopted [in 1985, effective 1986], this court had held that agreements waiving the right to spousal support were unenforceable as being against public policy if the waiver would promote or encourage dissolution." (*Pendleton, supra*, 24 Cal.4th at p. 46.) Examining changes in "[b]oth public attitude and contemporary official policy," the court further concluded that "changes in the law governing the spousal relation warrant[ed] reexamination of the assumptions and policy underlying the refusal to enforce waivers of spousal support." (*Id.* at pp. 48, 52.)

However, before undertaking that reexamination, the court had to consider whether the UPAA had deprived it of the power to reexamine that policy. In adopting the Uniform Act, the Legislature deleted a Uniform provision (subdivision (a)(4) of section 3) which would have expressly permitted the parties to modify or eliminate spousal support, and the sparse legislative history (two subcommittee reports) was ambiguous as to the purpose of the omission. Further, one of the reports erroneously described existing case law as prohibiting premarital waivers of spousal support, and indicated that the omission of the Uniform provision in the enacted legislation would keep that prohibition in place. (See *Pendleton, supra*, 24 Cal.4th at p. 44 [discussion of legislative history].) Thus, the court considered two possibilities for the omission: "[t]he Legislature may have intended to deny couples the right to enter into any premarital agreement regarding spousal support by adopting what the committee report erroneously described as the existing case law under which premarital waivers would be per se unenforceable. Alternatively, the Legislature may have concluded that policy governing spousal support agreements, having been established by the court in the past, should continue to evolve in the court." (*Id.* at p. 47.)

The court resolved this question by preserving the prerogative of the courts to shape public policy regarding the enforceability of premarital agreements on spousal support. The court reasoned: "The most reasonable understanding of the Legislature's purpose when it omitted subdivision (a)(4) is that it was satisfied with the evolution of the common law governing

25

premarital waivers of spousal support and intended to permit that evolution to continue. . . . . We agree with the Court of Appeal, therefore, that the court is free to reexamine the assumptions that underlie the common law rule that premarital spousal support waivers promote dissolution and for that reason contravene public policy." (*Pendleton*, *supra,* 24 Cal.4th at pp. 48–49.)

Having determined that the UPAA did not deprive it of the power to shape public policy regarding premarital spousal support waivers, and having concluded that reexamination of that policy was warranted, the court reached its ultimate holding: "We agree with the Court of Appeal, therefore, that, when entered into voluntarily by parties who are aware of the effect of the agreement, a premarital waiver of spousal support does not offend contemporary public policy. Such agreements are, therefore, permitted under section 1612, subdivision (a)(7), which authorizes the parties to contract in a premarital agreement regarding '[a]ny other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty.' [¶] We need not decide here whether circumstances existing at the time enforcement of a waiver of spousal support is sought might make enforcement unjust. It is enough to conclude here that no public policy is violated by permitting enforcement of a waiver of spousal support executed by intelligent, well-educated persons, each of whom appears to be self-sufficient in property and earning ability, and both of whom have the advice of counsel regarding their rights and obligations as marital partners at the time they execute the waiver. Such a waiver does not violate public policy and is not per se unenforceable as the trial court believed." (*Pendleton*, *supra,* 24 Cal.4th at pp. 53–54, fn. omitted.)

In a footnote to its statement that it "need not decide whether circumstances existing at the time enforcement of a waiver of spousal support is sought might make enforcement unjust," the court noted: "The Legislature may, of course, limit the right to enter into premarital waivers of spousal support and/or specify the circumstances in which enforcement should be denied." (*Pendleton, supra*, 24 Cal. 4th at p. 53.)

For our analysis here, three points of the court's decision in *Pendleton* stand out: (1) the preservation of the court's authority under section 1612, subdivision (a)(7) to determine the contours of public policy regarding the

26

enforceability of spousal support agreements; (2) the suggestion that changed "circumstances existing at the time enforcement of a waiver of spousal support is sought might make enforcement unjust"; and (3) the observation that the Legislature could "specify the circumstances in which enforcement should be denied." (*Pendleton, supra*, 24 Cal.4th at p. 53, fn. 12.)

### 3. *The Enactment of Senate Bill No. 78* (*2001–2002 Reg. Sess.*)

Effective 2002, in response to *Pendleton*, the Legislature (after incorporating various amendments to the original bill) passed Senate Bill No. 78 (2001–2002 Reg. Sess.); "SB 78"), which amended section 1612, as well as section 1615. As enacted, SB 78 created a new subdivision (c) of section 1612, which remains the same today. It specifically applies to premarital spousal support agreements, as follows: "(c) Any provision in a premarital agreement regarding spousal support, including, but not limited to, a waiver of it, is not enforceable if the party against whom enforcement of the spousal support provision is sought was not represented by independent counsel at the time the agreement containing the provision was signed*, or if the provision regarding spousal support is unconscionable at the time of enforcement*. An otherwise unenforceable provision in a premarital agreement regarding spousal support may not become enforceable solely because the party against whom enforcement is sought was represented by independent counsel." (Stats. 2001, ch. 286, § 1 (SB 78), italics added.)

SB 78 did not change section 1612, subdivision (a)(7), under which premarital parties may contract with respect to "[a]ny other matter, including their personal rights and obligations, not in violation of public policy." As noted, in *Pendleton* the Supreme Court had invoked this provision in preserving the court's authority to define public policy regarding premarital spousal support agreements.

In tandem with adding subdivision (c) to section 1612, SB 78 also made amendments to section 1615, the provision that governs the unenforceability of premarital agreements generally. With respect to the unenforceability of a premarital agreement under section 1615, subdivision (a)(2) because it was

"unconscionable when it was executed," the amendment made only one change not pertinent to our discussion.[13] (Stats. 2001, ch. 286, § 2.)

4. *Howell, supra,* 195 Cal.App.4th 1062

In *Howell, supra,* 195 Cal.App.4th 1062, the Court of Appeal considered whether section 1612, subdivision (c) is retroactive. In *Howell*, the trial court invalidated a 1999 premarital spousal support waiver by retroactively applying the provision of subdivision (c) of section 1612 making such an agreement unenforceable "if the party against whom enforcement of the spousal support provision is sought was not represented by independent counsel at the time the agreement containing the provision was signed." On appeal, the court held that the trial court had erred in retroactively applying section 1612, subdivision (c).

The court concluded that SB 78 changed existing law in response to *Pendleton* by "limit[ing] the right of parties to enter into premarital waivers (e.g., the independent counsel requirement) and specif[ying] the circumstances in which enforcement could be denied (e.g., the spousal support waiver is unconscionable at the time of enforcement)." (*Howell, supra*, 195 Cal.App.4th at p. 1072.) Noting that the legislation contained no express retroactivity provision, the court referred to the rule that "'in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature . . . must have intended a retroactive application.' [Citations.]" (*Id*. at p. 1074.)

Examining the legislative history, the court determined that the Legislature did not intend the 2002 amendment to apply retroactively. After charting the proposed amendments to SB 78 made in May 2001 (adding to proposed section 1612, subdivision (c) an independent counsel requirement) and June 2001 (adding unconscionability at the time of enforcement as a

---

[13] The Legislature added that the party against whom enforcement was sought must have been provided a *"fair, reasonable, and* full disclosure" of the other party's property or financial duties, whereas the prior version simply required a "fair disclosure." (Stats. 2001, ch. 286, § 2, italics added.)

ground for nonenforcement), the court looked to a Senate Judiciary Committee analysis of the original version of the bill (prior to the May and June 2001 amendments) to discern the Legislature's intent in passing the final bill. (*Howell, supra*, 195 Cal.App.4th at pp. 1074–1076.) The Senate Judiciary report "noted that those opposed to the bill were concerned 'over the possible retroactivity of a prohibition on spousal support waivers . . . .' (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 78 (2001–2002 Reg. Sess.) as introduced Jan. 11, 2001, p. 10.) The Senate Judiciary Committee report went on to note that Senate Bill No. 78 'contains no provision for retroactive application,' and cited the general rule that 'laws operate prospectively unless retroactive application is provided for specifically, or unless the new legislation clarifies existing law.' (*Id*. at p. 11.)" (*Id*. at p. 1075.) Based on this comment, and in the absence of any provision for retroactive application, the court concluded that "the legislative history of Senate Bill No. 78 supports the conclusion that the Legislature did not intend subdivision (c) of section 1612 to apply retroactively." (*Howell, supra*, 195 Cal.App.4th at p. 1075.)

Because section 1612, subdivision (c) did not apply retroactively, the court set aside the trial court's invalidation of the spousal support agreement based on the absence of independent counsel. The court then analyzed the remainder of the trial court's decision and concluded substantial evidence supported the trial court's findings that the agreement was nether involuntarily entered nor unconscionable when executed. (*Howell, supra*, 195 Cal.App.4th at pp. 1078–1080.) In a footnote, the court noted: "After the 2002 amendment to section 1612, a spousal support provision in a premarital agreement—including the waiver of such support—is deemed unenforceable if the provision 'is unconscionable *at the time of enforcement*.' (§ 1612, subd. (c), italics added.) However, under former section 1615, subdivision (a)(2), which we apply here, unconscionability is determined at the time the premarital agreement '*was executed*.'" (*Id*. at p. 1080, fn. 12, italics added.)

### 5. *Facter, supra,* 212 Cal.App.4th 967

In *Facter, supra,* 212 Cal.App.4th 967, the court agreed with *Howell* that section 1612, subdivision (c) is not retroactive. But it appeared to

29

disagree (on grounds not entirely clear) with *Howell's* assertion (195 Cal.App.4th at p. 1081, fn. 12) that when examining a pre-2002 premarital spousal support agreement for unconscionability, a court is limited to an examination under section 1615, subdivision (a)(2) of the circumstances existing when the agreement was executed.

In *Facter,* the trial court applied section 1612, subdivision (c) retroactively to invalidate a 1994 spousal support waiver as being unconscionable at the time of enforcement. (*Facter, supra*, 212 Cal.App.4th at p. 981, and fn. 19.) On appeal, relying on *Howell,* the court held that the trial court erred in applying section 1612, subdivision (c) retroactively. The court observed, however, that "the Supreme Court in *Pendleton* did not set a precise standard for when a spousal waiver is deemed unconscionable." (*Facter*, *supra*, 212 Cal.App.4th at p. 982.) In an accompanying footnote, the court noted that "[f]ormer section 1615 (pertaining to unenforceable premarital agreements) applies to premarital agreements as a whole and does not specifically reference spousal support waivers. Accordingly, we rely primarily on case law in evaluating whether the waiver in the Agreement is unconscionable. (See *Pendleton, supra*, 24 Cal.4th 39, 48–49 ['The most reasonable understanding of the Legislature's purpose when it omitted [the UPAA's spousal support language from section 1612's list of permissible objects of a premarital agreement] is that it was satisfied with the evolution of the common law governing premarital waivers of spousal support and intended to permit that evolution to continue.'].)" (*Facter*, *supra,* 212 Cal.App.4th at p. 982, fn. 21.)

Distinguishing the circumstances at the time of execution of the agreement in the case before it with those in *Pendleton* and *Howell,* the court appeared to hold (without expressly so stating) that the agreement was unconscionable at the time it was executed. (*Ibid*.) But the court went further: "The Supreme Court in *Pendleton* also suggested that circumstances existing at the time of the enforcement of a spousal support waiver 'might make enforcement unjust.' [Citation.]" (*Facter, supra*, 212 Cal.App.4th at p. 983.) The court then analyzed the circumstances of the parties at the time of enforcement and concluded: "Given that Jeffrey's [husband's] self-reported separate property is now in excess of $10 million and his earnings $1 million

30

per year, whereas Nancy [wife] amassed no separate property during the marriage and has no income at all, we have little difficulty in concluding that the Agreement's spousal support waiver is presently unconscionable." (*Facter, supra*, 212 Cal.App.4th at p. 984.)

### 6. *Unconscionability at the Time of Enforcement*

Like *Facter,* we agree with *Howell* to the extent it held that section 1612, subdivision (c), in and of itself, is not retroactive.  But we do not agree with the implicit conclusion of *Howell* that the non-retroactivity of section 1612, subdivision (c) means that, under section 1612, subdivision (a)(2), a court considering the unconscionability of premarital spousal support agreements entered between 1986 and 2002 is limited solely to the circumstances existing at the time of execution.  To the contrary, as apparently recognized in *Facter* (though the details are not fleshed out) we conclude that the Legislature did not intend to eradicate the authority of the court, recognized in *Pendleton,* to shape public policy regarding spousal support agreements for the protection of the parties.  Thus, we hold that in considering whether a premarital spousal support agreement entered between 1986 and 2002 is enforceable, the court is not limited to the section 1615, subdivision (a)(2) determination whether the agreement was unconscionable when executed.  Rather, the court retains the power under section 1612, subdivision (a)(7) (identified in *Pendleton, supra,* 24 Cal.4th at pp. 48–49) to shape public policy regarding premarital spousal support agreements to the extent not inconsistent with Legislative declarations of such policy, and to declare (as suggested in *Pendleton, id.* at pp. 53–54) that a premarital spousal support agreement is unenforceable as against public policy solely because it is unconscionable at the time of enforcement.  We reach this conclusion for three reasons.

First, as we have noted, in *Pendleton*, the California Supreme Court held that the adoption of the UPAA did not deprive the court of the power to shape the extent to which a premarital spousal support waiver may be unenforceable as against public policy under section 1612, subdivision (a)(7).  The court also left open the possibility that such agreements are unenforceable based on circumstances existing at the time of enforcement.

And it did so even though section 1615, subdivision (a)(2) expressly provided that premarital agreements were unenforceable if unconscionable at the time of execution, not the time of enforcement. Thus, if the reference to unenforceability at the time of execution in section 1615, subdivision (a) controlled, there would have been no need for the *Pendleton* court to mention the possibility that a court might find a premarital spousal support agreement unenforceable as unjust at the time of enforcement.

Second, *Howell's* determination of non-retroactivity relied in large part on its interpretation of a comment in a report of the Senate Judiciary Committee describing SB 78 as introduced. Omitted in the court's summary of the comment is language important for the issue that faces us here: whether, by not making SB 78 retroactive, the Legislature intended to vitiate the court's power, to the extent not inconsistent with Legislative declarations, to shape public policy regarding the enforceability of premarital spousal support agreements.

The entire comment referred to in *Howell* states, with the language omitted by *Howell* in italics: "Opponents of the bill further express concern over the possible retroactivity of a prohibition on spousal support waivers, *particularly as some premarital agreements waiving spousal support may have been executed in reliance on the original* <u>Pendleton</u> *decision by the Court of Appeal in 1998* (*upheld by the Supreme Court in 2000*). [¶] This bill contains no provision for retroactive application. As a general rule, laws operate prospectively unless retroactive application is provided for specifically, or unless the new legislation clarifies existing law." (Sen. Bill Analysis, SB 78 (2001-2002 Reg. Sess.) pp. 10–11, italics added.)

Thus, the specific concern of the opponents of the bill was the possible retroactivity of "a prohibition on spousal support waivers," particularly as to the expectations of parties who entered premarital agreements waiving spousal support in reliance on the original Court of Appeal decision in *Pendleton* (for ease of reference, *Pendleton 1*). Of course, as adopted, section 1612, subdivision (c) did not contain the per se prohibition. More importantly, the opinion in *Pendleton 1* endorsed the power of the court to declare premarital spousal support agreements unconscionable at the time of enforcement.

32

In *Pendleton 1*, the Court of Appeal noted that under section 1615, a premarital agreement was unenforceable if it "was unconscionable when executed" and the trial court made the findings listed in that section. (See former 62 Cal.App.4th 751, 759, fn. 9, depublished by grant of review.) The opinion suggested a need for changes in the conditions of enforcement under section 1615, and further stated that until then "the courts will have to decide enforcement issues in conformance with the rules that *are* expressed in Family Code section 1615 *and* the policies underlying both the Uniform Act and the California Act." (See former 62 Cal.App.4th at p. 759, fn. 9.)

Amplifying on the role of the courts, the opinion referred to a then-current version of a secondary treatise which "not[ed] the absence of *any* reported California case involving an unconscionability claim vis-à-vis a premarital agreement and quoting the standard under the Uniform Act, to the effect that, 'in determining whether a premarital agreement is unconscionable, courts "may look to the economic circumstances of the parties resulting from the agreement, and any other relevant evidence."'" (Former 62 Cal.App.4th at p. 759, fn. 9.)

On the same point the opinion also cited *Lewis v. Lewis* (1988) 69 Haw. 497. In that case, the Hawaii Supreme Court held that a premarital spousal support agreement must be evaluated for unconscionability not only at the time of execution, but also, as a matter of public policy, at the time of enforcement. (See former 62 Cal.App.4th at p. 759, fn. 9; see also *Lewis v. Lewis* (1992) 69 Haw. 497, 503 ["To enforce a spousal support provision of a premarital agreement because it was reasonable at the time of execution of the agreement can result in unforeseen economic hardship to a spouse that may shock the conscience of the court due to relevant changes in the circumstances of the marriage by the time of divorce. Public policy mandates against the enforcement of unconscionable support payments"].) Although the holding of *Lewis* is not specifically mentioned in *Pendleton 1*, the import of the citation to *Lewis* is clear.

In short, *Pendleton 1* contemplated courts evaluating unconscionability as a matter of public policy at the time of enforcement. Agreements entered by parties in reliance on *Pendleton 1* would have taken that fact into account. Therefore, to the extent the opponents to SB 78 expressed concern regarding

invalidation of premarital spousal support agreements entered into by parties who relied on *Pendleton 1,* and to the extent the Legislature responded to that concern by not making section 1612, subdivision (c) retroactive, the Legislature certainly did not intend to preclude a court from declaring, as a matter of public policy under section 1612, subdivision (a)(7), that a premarital spousal support agreement was unenforceable as being unconscionable at the time of enforcement.

Indeed, the Legislature added section 1612, subdivision (c) in response to *Pendleton* to provide greater legislative protections to parties against whom a premarital spousal support agreement is sought to be enforced. Nothing in the statute or Legislative history suggests that the Legislature meant to eradicate the court's independent power, recognized in *Pendleton,* to define public policy, especially as it might relate to invalidation of a premarital spousal support agreement based on circumstances existing at the time of enforcement.

Finally, it is true that, as a general matter, courts examine the unconscionability of contracts as of the time of execution. (See Civ. Code, § 1670.5, subd. (a).)[14]  But as illustrated by case law evaluating the substantive unconscionability of arbitration agreements in cases brought under FEHA (the California Fair Employment and Housing Act; Gov. Code, § 12900 et seq.), in some circumstances it is appropriate to examine the unconscionability of contract provisions as of the time of enforcement. Although the parties to an employment arbitration agreement may agree to something less than the full panoply of discovery available in California's discovery statutes (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 105–106), courts have recognized that such agreements must "'ensure minimum standards of fairness' so employees can vindicate

---

[14]    Section 1670.5, subdivision (a) provides that: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

their public rights. [Citation.]" (*Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 716.) Whether such minimum standards of fairness exist is examined at the time of enforcement of the agreement, not execution of the agreement, and is analyzed based on the specific discovery needs of the plaintiff's case. "In striking the appropriate balance between the desired simplicity of limited discovery and an employee's statutory rights, courts assess the amount of default discovery permitted under the arbitration agreement, the standard for obtaining additional discovery, *and whether the plaintiffs have demonstrated that the discovery limitations will prevent them from adequately arbitrating their statutory claims.* [Citation.]" (*Davis v. Kozak* (2020) 53 Cal.App.5th 897, 910–911, italics added.)

As illustrated by the cases involving employment arbitration agreements, when important statutory rights are at stake, courts are not always constrained to examine unconscionability at the time of execution of an agreement. We acknowledge that the analogy to premarital spousal support agreements is not perfect. But California recognizes the centrality in dissolution proceedings of the trial court's broad statutory discretion to fashion an appropriate award of spousal support (or no award at all) based on the parties' present abilities to provide for their own needs and the standard of living established during the marriage. (§§ 4320, 4330, subd. (a); see *Pendleton, supra,* 24 Cal.4th at p. 52.) In light of the importance of the right to spousal support in appropriate cases, we see no reason why, as a matter of public policy, a premarital agreement entered between 1986 and 2002 waiving or limiting the right to spousal support ought not be examined by a court for unconscionability at the time of enforcement. (See *Melissa, supra,* 212 Cal.App.4th at pp. 610–611 ["The rules and underlying public policy regarding support waivers has swung like a pendulum from the one extreme of complete prohibition, to the other extreme of being condoned but highly regulated with technical requirements and safeguards. While we no longer believe prenuptial agreements containing spousal support waivers encourage dissolution or will harm society, we are also well aware of the need for safeguards to ensure fairness and voluntariness"]).

Thus, despite the non-retroactivity of section 1612, subdivision (c), we hold that the court retains the power under section 1612, subdivision (a)(7)

(identified in *Pendleton*) to shape public policy regarding premarital spousal support agreements to the extent not inconsistent with Legislative declarations of such policy, and to declare (as suggested in *Pendleton*) that a premarital spousal support agreement is unenforceable as against public policy solely because it is unconscionable at the time of enforcement. In the instant case, therefore, the trial court did not err in considering whether the spousal support provision of the PMA was unconscionable at the time of enforcement.

We further conclude that the trial court properly found the spousal support provision in the PMA unconscionable at the time of enforcement.

In *Facter,* in concluding that the spousal support provision was unconscionable at the time of enforcement, the court observed that the wife had a high-school education and was unemployed throughout the 16-year marriage, while the husband had an annual income of $1 million and a net worth of $10 million. Here, Kim's forensic accountant had opined that Kim would need $86,000 per month to meet the marital lifestyle based on an income-available approach, while an expenditure approach would yield $37,000 per month. Kim, like the wife in *Facter,* was unemployed, similarly educated, and spent the marriage raising the couple's six children. The trial court found the amount Kim would receive under the PMA—"merely 10% of the probable order without the agreement"—was unconscionable.

We find no flaw in the trial court's reasoning. Many years had elapsed since the time of execution, and Kim had foregone employment outside of the home, while at the same time Mark continued to amass a large separate property fortune from his business. As a result, $6,000 a month in spousal support under the agreement compared to Mark's monthly earnings of upwards of approximately $250,000 was oppressive. Further, we note as well that Kim had already waived any community property interest in Mark's income.[15] We therefore affirm the trial court's invalidation of the spousal support provision of the PMA.

---

[15] Mark filed a letter brief citing the recently decided case of *Miotke, supra,* 35 Cal.App.5th 849 on the issue of the time of evaluation of unconscionability. He does nothing other than draw this court's attention to

36

## PHASE II: SUPPORT ISSUES

## I.    THRESHOLD ISSUE: DATING OF MARK'S INCOME

As a threshold issue regarding phase II, Kim contends the trial court erred because it used Mark's income from the period 2011-2013 to calculate his cash flow in mid-2016 to determine funds available for child and spousal support. Mark counters that the trial court did not abuse its discretion in using a time period that it found more reliably predicted Mark's future income. We agree with Mark.

### A.    *Factual Background and Procedural Summary*

#### 1.    *Testimony and Other Evidence Regarding Mark's Income*

Discovery cutoff was in August 2014. (See Code Civ. Proc., § 2024.020, subd. (a).) As a result, the most recent information available when trial commenced in September 2014 was Mark's Income and Expense Declaration dated August 27, 2014, containing income information through March 31, 2014. During trial, Kim sought additional financial information.[16]

Trial was continued to May 2016. Kim persisted in her attempts to get updated financial information. From the bench in February 2016, the court stated that "I'm not going to give any further discovery. Whatever [Kim's forensic accountant] Mr. Zuckerman has, let him deal with it. No new documents . . . unless [Mark] seeks to present evidence of income different than what he's presented so far, I'm not going to have any new documents."

---

the case. For good reason—*Miotke* concluded the issue had been waived by the wife's failure to raise it in the trial court. (*Id.* at p. 861.)

[16] According to Kim, during trial in December 2014, she issued trial subpoenas duces tecum seeking additional documents. After Mark objected and Kim sought to compel production, the trial court granted partial production. In October 2015, during a telephonic conference, Kim sought additional financial information, but the trial court issued a written order stating that the parties could not seek documents via trial subpoenas unless they were based on new issues. None of these materials are part of the record.

At trial, the court heard expert testimony on Mark's income for the period 2011 to 2013. During this time, Mark managed hedge funds and purchased speculative partnership interests with deep discount values. His investment business was changing, and he had gone from $1.5 billion in assets under management in 2008 to $273 million at the time of trial; investors had demanded their money back. The funds producing income in 2014 were almost entirely based upon a return of capital ("harvesting") and thus were unique, and as a result, his income in 2014 was 18 times the income in 2011 and 2012. Dorchester was having trouble raising capital and many employees had left; in 2014 investors lost one-third of their investments, and it took several years for the firm to recover.

Kim's forensic accountant determined Mark's income for 2014 to be $8.7 million, or approximately $700,000 per month.

### 2. *Court's Findings*
#### (a) *Sufficiency of 2011-2013 Income Figures*

The court found that "Mark's income is not consistent from year to year and the parties disagreed as to what time period the court should use to compile a representative prediction of future income. Mark suggested several alternative periods but also offered testimony that the nature of his business has changed, likely reducing his future income. He pointed to exhibit 1030 which showed a substantial decline in assets under management [at] Dorchester . . . in 2014," and that a "certain class of investments that were generated by the financial disruptions around 2008 [were] no longer available."

The court noted that Mark was not ordered to provide full financial information for 2015 and 2016. "For a variety of reasons, the trial of the reserved issues in this case took an extended period of time commencing in December 2014 and not concluding until mid-2016. Mark argued and the court concluded that it would be disruptive and ultimately not beneficial to have a constantly moving target for income calculation and document production. The court will use the years 2011-2013 as a representative period to judge Mark's income." The court declined to use 2014 income figures because that year appeared to be an "outlier."

38

Using the income of Dorchester and Reflection for this period, the court found Mark's average monthly income to be $259,432.

B.  *Discussion*

Kim asserts that she was prejudiced by the trial court's failure to permit her to obtain current financial information from Mark, and that "harvesting" was not a one-off occasion but occurred on a regular basis. Thus, a multi-year sampling of income cannot be properly "representative" if the highest income year is eliminated. As such, the court erred in concluding there was no prejudice because there would have been no difference in its ruling even if the 2014 income had been considered. She contends the court essentially gave Mark credit for the possibility of reduced income, rather than waiting for reduced income to occur. We find the trial court did not abuse its discretion in selecting the years 2011-2013, and excluding 2014, to calculate Mark's income.

Permanent spousal support "'is governed by the statutory scheme set forth in sections 4300 through 4360. Section 4330 authorizes the trial court to order a party to pay spousal support in an amount, and for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances set forth in section 4320.'" (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1442 (*Blazer*).) There is no statute defining income for the purpose of determining spousal support, and this determination is left to the trial court's discretion. (*Id.* at p. 1445.) However, in evaluating support, the trial court cannot engage in speculation, and an order for spousal support must be based on the facts and circumstances existing at the time of the order. (*In re Marriage of Tydlaska* (2003) 114 Cal.App.4th 572, 575 [request for modification of child and spousal support denied where income and expense declaration not current].)

In *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075 (*Riddle*), upon which Kim relies, the court held that the trial court abused its discretion by calculating income for child and spousal support orders based on the husband's latest two months of earnings as a commissioned financial advisor at an investment firm. (*Riddle, supra*, 125 Cal.App.4th at p. 1077.) The

39

court in *Riddle* concluded the trial court should have used a properly representative sample, which presumptively would have been the previous 12 months. (*Ibid.*)

Because the husband's monthly income fluctuated, *Riddle* relied on sections 4060[17] and 4064,[18] "the two statutes which deal with the problem of calculating fluctuating income for support orders." (*Riddle, supra*, at p. 1081.) *Riddle* explained that "[t]he aim of section 4060 is to give a trial court discretion to adjust the annual net adjustable income required for a support order when dividing net disposable income by 12 'does not accurately reflect the actual or prospective earnings of the parties.' Section 4064 gives a trial court the authority to adjust a child support order 'as appropriate to accommodate seasonal or fluctuating income of either parent.' While both statutes are framed in discretionary terms, it is also well established that the discretion must be a reasonable one, "'exercised along legal lines, taking into consideration the circumstances of the parties, their necessities and the financial ability of the [supporting spouse].""" (*Riddle, supra*, 125 Cal.App.4th at p. 1081.)

As noted in *Riddle*, the purpose of using this method of calculating child support, when income fluctuates, is to provide a reasonable predictor of what each parent will earn in the immediate future. (*Riddle, supra*, 125 Cal.App.4th at p. 1081; see *County of Placer v. Andrade* (1997) 55 Cal.App.4th 1393, 1396 ["The assumption underlying these calculations is that past income is a good measure of the future income from which the parent must pay support"].) "The theory is that the court is trying to predict

---

[17] Section 4060 provides: "The monthly net disposable income shall be computed by dividing the annual net disposable income by 12. If the monthly net disposable income figure does not accurately reflect the actual or prospective earnings of the parties at the time the determination of support is made, the court may adjust the amount appropriately."

[18] Section 4064 provides: "The court may adjust the child support order as appropriate to accommodate seasonal or fluctuating income of either parent."

*likely* income for the immediate *future*, as distinct from extraordinarily high or low income in the *past*." (*Riddle, supra*, at p. 1082.)

*In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, likewise involved an order of pendente lite spousal support from a husband whose income fluctuated due to monthly sales commissions. (*Riddle, supra*, 125 Cal.Appp.4th at pp. 1077–1078.) The trial court utilized a sample size of just two months in calculating support payments. (*Id*. at p. 1078.) *Rosen* held this was error, reasoning that "the time period on which income is calculated must be long enough to be *representative*, as distinct from *extraordinary*." (*Id*. at p. 1082.) *Riddle* held that a 12-month period is "an appropriate period in most cases," but acknowledged that a longer period could be conceivably used "*if* it were more representative of a party's income." (*Id*. at pp. 1083–1084.)

We review spousal support orders under the deferential abuse of discretion standard and examine the challenged order for legal and factual support. "'As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it.'" (*Blazer, supra,* 176 Cal.App.4th at p. 1443.)

Here, due to the fluctuation in Mark's income from year to year, we encounter a situation requiring a longer time period to generate a representative sample. Hence, the trial court's reliance on a period spanning more than one year was appropriate. Further, *Rosen* and *Riddle* support the trial court's actions: Mark's evidence established that his income fluctuated from year to year. As the purpose of income calculation in such case is to select the time period that most accurately reflects the spouse's income, the court here could have reasonably concluded, by crediting Mark's evidence, that 2014 was indeed an "outlier" year and thus should not be used to calculate his income. As observed in *Riddle,* the court is trying to predict likely income for the immediate future, as distinct from extraordinarily high or low income in the past. (*Riddle, supra,* 125 Cal.App.4th at p. 1082.) Thus, Kim's focus on the trial court's refusal to use "up to date" income figures reflecting Mark's income at the time of trial in 2016 does not translate into an abuse of discretion. As we find no error, we need not address Kim's claims of prejudice.

## II.    SUPPORT ISSUES

Kim contends the below-guideline child support order is riddled with errors, as illustrated by a comparison of the pendente lite order with the final order; the trial court's failure to make specific findings under section 4056; its reliance on an unpublished opinion to adopt the "odious comparison" standard; and its failure to apply proper standards in considering Kim's housing expenses.

Kim also seeks to modify the spousal support order based upon invalidation of the PMA, arguing the court failed to retroactively modify the temporary support order.[19]  She also argues there is no way to determine whether, or how, the trial court adjusted spousal support in light of its potential tax impact.

### A.    *Factual Background*
#### 1.    *Pendente Lite Order*

On February 28, 2012, the trial court (by a different judge than the trial judge) entered a pendente lite support order.  This order awarded Kim $25,558 per month child support but did not include a housing component because Kim remained in the home.  At Mark's request, the court deviated from the guideline amount based upon its finding that a higher award, even given Mark's monthly income of $213,668, was not warranted because it would be more than the children's reasonable needs.  The award was retroactive to July 1, 2011.  The court also awarded temporary spousal support of $6,983, retroactive to October 1, 2012.

In calculating the support amount, the court awarded a savings component of $7,500, finding "[i]t is in the children's best interest to have a savings component of a child support award to cover irregular and difficult to predict contingencies.  [¶]  Ordinary prudence dictates this result. . . .  The

---

[19]    Kim also apparently disputes the amount of the award itself, but does not develop any argument why the figure itself is in error.

42

court determined the amount based on the number of children, the apparent lack of a current reserve under [Kim's] control, and [Mark's] station in life."

In addition, as discussed more fully *infra,* the court limited the amount of support to $6,983 based upon the terms of the PMA.

### 2. *Kim's Request for Order (RFO) re Modification*

After invalidation of the spousal support provision of the PMA, in March 2014, Kim filed an RFO seeking to modify the temporary support order. The trial court found that Kim's arguments, based solely on this fact, ignored the prior judge's findings that the use of the residence, with no *Watts*[20] payment, met Kim's reasonable needs at the standard of living of the marriage. Further, Mark had expended additional sums in payment of the minor and adult children's expenses and had not demanded vacation of the residence. "A retroactive modification would not adequately consider these actions taken . . . . The court finds that there has been no substantial change in circumstances and denies modification of the temporary order."

### 3. *Trial Court Ruling*

#### (a) *General Findings Regarding the Parties' Income*

*Kim.* The court adopted its findings regarding Kim's income from Phase I, observing that beyond high school, Kim had no degrees, job certifications, or job training; she never maintained a job for more than a short period of time; and her finances were supervised by her mother until she married. Since the parties' marriage in February 1994, Kim had not been employed outside the home, instead devoting her efforts to raising the couple's six children; she continued to care for the three remaining minor children. Kim had no job skills or job history, had a history of medical and psychological issues, and was entering her mid-50s. Further, Kim received assistance from her mother, which was sometimes characterized by the parties as loans or gifts, but the court did not find they were income. Based

---

[20]     A *Watts* credit is a "reimbursement to the community for the exclusive use of a community property asset by one spouse." (*In re Marriage of Watts* (1985) 171 Cal.App.3d 366, 373.)

on the foregoing, the court declined to impute any income to Kim, and found her income to be zero.

*Mark*. Mark was a manager of investment entities, receiving a variety of forms of compensation from business entities operating under the Dorchester name. Mark had a separate investment vehicle known as Reflection Partners (Reflection), of which he owned 81 percent and the children held 19 percent. Reflection received income from capital gains (and losses), interest, and other business activities. The court adopted Mark's assertion that there had been no distribution to him from Reflection and Reflection's income was reinvested and was not used for family expenses during the marriage. The court nevertheless included the income of Reflection as cash available to Mark for support payments. These figures were set forth on Exhibit 1156 (not part of the record), and Kim did not dispute those amounts.

### (b)    *Child Support*

The court applied section 4055's complex formula[21] to calculate child support, and stated that pursuant to section 4057, subdivision (a) the calculated sum was the presumptively correct sum for child support. The court concluded Mark's income was higher than had been determined in the temporary order, and his income was higher than the income qualifying as an exceptionally high earner in several reported cases. Thus, the high earner exception of section 4057, subdivision (b)(3) applied and the "deviation from guideline child support will be in the best interest of the children as their needs will be met without overly indulging them."

The court calculated guideline child support based on Mark's monthly income of $113,727 in wages and $145,705 of other taxable income, less

---

[21]    Section 4055 provides a uniform guideline formula where CS = K[HN - (H%)(TN)]. As more fully defined in the statute, CS is child support, K is the amount of both parents' income to be allocated for child support, HN is a high earner's net monthly disposable income, H is the approximate percentage of time that the high earner has or will have primary physical responsibility for the children compared to the other parent, and TN is the total net monthly disposable income of both parties.

expenses and deductions. Total guideline child support for the three remaining minor children was $26,374, but the court deviated from the guidelines based upon what it determined were the reasonable expenses of the children. The court observed that "[c]hild support is not limited by historical spending averages but should meet the standard of living of the higher income parent," citing *In re Marriage of Chandler* (1997) 60 Cal.App.4th 124. Further, "the court's goal is to provide funds sufficient that the children will not draw odious comparisons between the two households. The children need only share the lifestyle of the wealthy parent 'to some degree,'" citing *In re Marriage of Hubner* (1988) 205 Cal.App.3d 660 (*Hubner*). The court found the three minor children's reasonable monthly expenses to be $16,000 per month, with $4,000 of that sum attributable to housing, plus private school tuition, temple memberships, summer camps, and tutors. However, the court did not award a savings component, stating, "Mark has made those provisions through [one of his companies, Reflection Partners]."

### (c) *Spousal Support*

As part of its unconscionability finding, the trial court found that Kim's marital standard of living (MSOL) was a net figure of $37,000 monthly, or a pretax figure of between $55,000 to $60,000 monthly. The court also found Mark's income to be $4 million annually and set his net worth at $19 million. On March 24, 2014, Kim sought an increased and retroactive spousal support award based upon these findings. The trial on this issue became part of the Phase II support proceedings.[22]

Mark argued that although the trial court invalidated the spousal support provisions of the PMA, the trial court should not approach the issue as a "clean slate" but instead consider the parties' PMA and adjust the agreement until it is no longer unconscionable. The court declined to do so, stating "While the court does have the power to vacate portions of contracts between parties, it cannot rewrite the terms of a contract." As a result, the

---

[22] These proceedings consumed 40 sessions occurring between September 2014 and May 2016.

trial court made the spousal support order that would be applicable in the absence of the PMA.

The court observed it would consider the factors of *In re Marriage of Smith* (1990) 225 Cal.App.3d 469 to determine the marital standard of living, and that consideration of those categories yielded a standard that "was in the lower end of upper income." Kim had sought a lump sum payment to cover first and last months' rent ($100,000 to $150,000), moving costs ($26,000) and furniture replacement ($815,000). The court found the estimates not credible, and that no authority has been cited for lump sum payments of this sort. Instead, the court decided to build reasonable expenses for these items into the support award. The court concluded Kim's needs and the needs of the three remaining minor children could be met by a rental in the range of $15,000 per month, and assigned $4,000 of that sum to child support, leaving $11,000 for Kim's spousal support. Kim's other needs totaled $15,000 for a total of $26,000 per month.

The court awarded $40,000 per month spousal support, with $15,000 of that coming off the top if Kim remained in the Malibu marital residence.

Weighing the 4320 factors,[23] the court found under subdivision (e) that Mark had substantial assets in the range of $20 million, while Kim's assets

---

[23] Section 4320 requires the court to consider numerous circumstances, including those relevant here: "(a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following: [¶] (1) The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment. [¶] (2) The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties. [¶] (b) The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party. [¶] (c) The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living. [¶] (d) The

were in the thousands of dollars. Regarding factor (f), "this is a lengthy marriage which deepens Mark's obligations to Kim in light of an extended period at a high standard of living."[24] Further, the court "has taken into account the tax consequences of spousal support."

B. *Discussion*

1. *Child Support*

California has a strong public policy in favor of adequate child support, expressed in statutes embodying the statewide uniform child support guideline. (§§ 4050–4076; *In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1048 (*Cryer*).) A parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life. (§ 4053, subd. (a).) Each parent should pay for the support of the children according to his or her ability. (§ 4053, subd. (d).) "Children should share in the standard of living of both parents. Child support may therefore

---

needs of each party based on the standard of living established during the marriage. [¶] (e) The obligations and assets, including the separate property, of each party. [¶] (f) The duration of the marriage. [¶] (g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party. [¶] (h) The age and health of the parties. [¶] . . . [¶] (j) The immediate and specific tax consequences to each party. [¶] (k) The balance of the hardships to each party. [¶] (l) The goal that the supported party shall be self-supporting within a reasonable period of time. Except in the case of a marriage of long duration as described in Section 4336, a 'reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage. However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section, Section 4336, and the circumstances of the parties. [¶] . . . [¶] (n) Any other factors the court determines are just and equitable."

[24] The court stated that the 4320, subdivision (a)(2), (b), (i) [domestic abuse], (l) and (m) [criminal background] did not apply and that its analysis of subdivisions (a)(1), (c) and (d) were "set forth above."

appropriately improve the standard of living of the custodial household to improve the lives of the children." (§ 4053, subd. (f).)

The statewide uniform guideline under section 4055 determines child support according to a complex formula based on each parent's income and custodial time with the child. (*In re Marriage of McHugh* (2014) 231 Cal.App.4th 1238, 1245.) The term "guideline" is a misnomer because the amount generated by the guideline formula is presumptively correct. (*In re Marriage of Hubner* (2001) 94 Cal.App.4th 175, 183; §§ 4053, subd. (k), 4057, subd. (a).) Under section 4057, the guideline figure "is a rebuttable presumption affecting the burden of proof and may be rebutted by admissible evidence showing that application of the formula would be unjust or inappropriate in the particular case, consistent with the [policy] principles set forth in Section 4053." (§ 4057, subd. (b).)

The amount of child support may vary from the guideline when the parent paying the support "has an extraordinarily high income and the amount determined under the formula would exceed the needs of the children." (§ 4057, subd. (b)(3).) What constitutes reasonable needs for a child varies with the circumstances of the parties. (*In re Marriage of Chandler, supra,* 60 Cal.App.4th at p. 129.) "[I]n the case of wealthy parents . . . the well-established principle [is] that the 'child's need is measured by the parents' current station in life.' [Citations.]" (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 293 (*Cheriton*).)

Thus, a child's need is for more than "bare necessities" and varies with the parents' situation. "'Accordingly, where the supporting parent enjoys a lifestyle that far exceeds that of the custodial parent, child support must to some degree reflect the more opulent lifestyle even though this may, as a practical matter, produce a benefit for the custodial parent.'" (*Johnson v. Superior Court* (1998) 66 Cal.App.4th 68, 71.) In *S.P. v. F.G.* (2016) 4 Cal.App.5th 921, 924–925, the court found no error in deviating downward from guideline formula where the support order reflected the child's best interest and provided standard of living commensurate with a "financially privileged child."

Where the trial court departs from the guideline amount, it is required to state for the record its reasons and why the support ordered is in the

child's best interests. (§ 4056, subds. (a)(2), (3).) However, the requisite findings can be implied from the record where they are not explicitly stated. (*S.P. v. F.G., supra,* 4 Cal.App.5th at p. 935.)

We will not overturn a child support award absent a showing of a clear abuse of discretion resulting in prejudicial error. (*S.P. v. F.G., supra,* 4 Cal.App.5th at p. 935.) "[W]e do not substitute our judgment for that of the trial court, and we will disturb the trial court's decision only if no judge could have reasonably made the challenged decision." (*Cryer, supra*, 198 Cal.App.4th at pp. 1046–1047.) In reviewing a child support order, however, "'we are mindful that "determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule." [Citation.]' [Citation.]" (*In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1312.)

(a)     *Below Guideline Order*

Kim argues the trial court erred in awarding support of $16,000, which was below the guideline $26,374 amount. She argues that the pendente lite order was based upon $213,668 per month of net income and awarded Kim $25,558 per month, while the trial court here awarded support based on a total of $259,432 per month, yet the monthly support order was less. Further, the pendente lite order included a savings component, while the trial court's order did not. As a result, she contends she could be placed under the fiscal control of Mark.

Other than pointing to the differences in the two awards,[25] and engaging in speculative argument, Kim presented no evidence the children's needs would not be met by the trial court's permanent support award. In the case of a high-earner spouse, the court may depart from the guidelines if the award meets the needs of the children. Here, there is no evidence their needs would suffer on a lesser award, particularly since Mark was obligated to

---

[25]     Pendente lite awards of child support differ from permanent awards in that the court on a permanent award is required to make findings. (*In re Marriage of Czapar* (1991) 232 Cal.App.3d 1308, 1316.)

49

separately pay for private school tuition, temple memberships, summer camps, and tutors.

### (b) *Sufficiency of Court's Section 4320 Findings*

Kim next argues that the trial court failed to make the required section 4320 findings under section 4056, and instead made conclusory statements that the award met the children's best needs. She complains that there is a complete failure to explain how the below guideline order even approaches the amount necessary for the children to share in Mark's station in life. Kim, however, does not specify the "amount necessary," does not state how this failure translates into prejudice to the children's needs, and does not demonstrate why the necessary findings cannot be implied from the record.

We therefore consider Kim's argument forfeited. Appellate briefs must provide argument and legal authority for the positions taken. We are not required to develop appellants' argument for them. The absence of clear legal argument or citation to authority allows this court to treat the contention as forfeited. (*Orange County Water Dist. v. Sabic Innovative Plastics US, LLC* (2017) 14 Cal.App.5th 343, 383.)

### (c) *Improper "Odious Comparison" Standard*

Kim argues the trial court's use of the "odious comparison" standard is based upon an unpublished decision and therefore its child support order departs from established standards for such awards.[26] The fact the trial court borrowed terminology from an unpublished case does not render its ruling unsound. The point of prohibiting comparison between households is

---

[26] *In re Marriage of Worthington* (2006) 2006 WL 1530609, an unpublished case, used this term to warn about the hazards of inadequate child support. (*Id.* at pp. 5–7.) Pursuant to California Rules of Court, rule 8.1115(a), an unpublished appellate court or superior court appellate department opinions must not be cited or relied on by a court or a party in any other action. (See *Aixtron, Inc. v. Veeco Instruments Inc.* (2020) 52 Cal.App.5th 360, 399 [refusing to consider unpublished, tentative decision from the superior court in Los Angeles County in an unrelated case].) Nonetheless, despite this rule, Kim discusses the case in her brief.

50

to ensure some form of parity with the wealthier parents' standard of living so that the children do not experience a lower standard because of the parents' dissolution. "'[W]here the supporting parent enjoys a lifestyle that far exceeds that of the custodial parent, child support must to some degree reflect the more opulent lifestyle even though this may, as a practical matter, produce a benefit for the custodial parent.'" (*Johnson v. Superior Court, supra,* 66 Cal.App.4th at p. 71.)

### (d)  *Housing Expenses*

Kim contends the trial court failed to apply the appropriate standards to determine the proper housing costs for purposes of child support.

### (i)  *Factual Background*

The parties lived during their marriage in a large house in Malibu. The parties stipulated the house had a fair market value of approximately $16 million. Mark's appraiser gave the property a fair rental value (year-round) per month of $25,500 (unfurnished) to $30,500 (furnished). Kim's expert agreed to a fair rental value of $25,000 per month, but believed if the house were cleaned and repaired, it would rent for $30,000 to $35,000 per month.

With respect to replacement housing, Mark's expert apparently limited his search to homes less than half the size of the marital home and did not consider proximity to the children's schools. After being replaced mid-trial, Mark's new experts opined that Kim could find replacement housing for $9,500 to $14,000.

The trial court concluded that "Kim has expressed a wish to remain in the Malibu area citing a variety of reasons including her own health issues. Where she chooses to live will be her choice but the court has focused its review on those options presented in Malibu. The listings offered into evidence were received not as locations for Kim to actually rent but as an example of what would likely be available in the future market. [¶] The court believes the reasonable needs for Kim and the remaining 3 minor children . . . can be met for a rental in the range of $15,000.00 per month. The court has assigned $4,000.00 of that sum to child support leaving costs of $11,000.00 for Kim's spousal support need at this time."

51

(ii)    *Discussion*

Kim contends the trial court erred in arriving at this figure because it did not permit Kim and the remaining minor children to live in any residence even closely comparable to the Malibu residence, or Mark's new $6.5 million Beverly Hills residence.  (See, e.g., *In re Marriage of Hubner, supra,* 205 Cal.App.3d at pp. 667–669.)

In *Hubner,* the trial court awarded below guideline child support.  The parents had widely disparate income levels, with the mother unemployed and the father earning more than $40,000 a month.  The court stated its order was based upon the needs of the child but awarded the mother only half of what the father agreed he could pay.  (*Hubner, supra,* 205 Cal.App.3d at p. 667.)  *Hubner* concluded that the "core of this dispute is whether the trial court, in setting child support, should focus on the noncustodial parent's wealth or the custodial parent's poverty.  We conclude that the primary focus must be on the parent's wealth, and that the trial court must frame its orders to assure, as best the court can, that the wealth flows to the child, and not to the custodial parent." (*Id.* at p. 667.)

As a result, *Hubner* reversed, observing that in crafting support, the Legislature referred, both to the "parent's circumstances" (§ 4720, subd. (e)) and to the "parents' standard of living" (§ 4724, subd. (a)).  "We agree with the trial court that some consideration should be given to the poorer parent's circumstances or standard of living.  However, at least where the ability of the noncustodial parent to pay a high level of child support is undisputed, and that level is also consistent with the guidelines, the inability of the custodial parent to make a meaningful financial contribution should not significantly affect the level of support ordered.  To emphasize the contributive abilities of both parents unrealistically deprives the child of a standard of living easily available to that child, but for consideration of the poorer parent's inability to contribute.  A child living with both parents, one of whom is a homemaker with no cash income, depends solely on the cash income of the earning parent." (*Hubner, supra*, 205 Cal.App.3d at p. 668.)

Here, Kim assumes she is entitled to absolute housing equivalency with Mark.  Rather, the children are entitled to share in Mark's wealth to the

52

extent that their housing would reflect what Mark could afford. On that basis, Kim cannot show that $15,000 per month ($4,000 a month, plus $11,000 of the spousal support order), is insufficient to ensure that the children maintain their father's lifestyle as far as possible.

### 2.    *Spousal Support*

There are two distinct types of spousal support under California law, based on the timing and the purpose of the award. (*In re Marriage of Mendoza & Cuellar* (2017) 14 Cal.App.5th 939, 942.) Temporary spousal support, awarded under section 3600, is intended to maintain the living conditions and standards of the parties as closely as possible to the status quo, pending trial and the division of the assets and obligations of the parties. (*In re Marriage of Wittgrove* (2004) 120 Cal.App.4th 1317, 1328.) In contrast, permanent spousal support is intended to provide financial assistance as determined by the financial circumstances of the parties after their dissolution and the division of their community property. (*In re Marriage of Winter* (1992) 7 Cal.App.4th 1926, 1932.)

Permanent spousal support is governed by the statutory scheme set forth in sections 4300 through 4360. In particular, section 4330 authorizes the trial court to order a party to pay spousal support in an amount, and for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances set forth in section 4320. (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 108 (*Ciprari*).) These statutory factors include the supporting spouse's ability to pay, the needs of each spouse based on the marital standard of living, the obligations and assets of each spouse, including separate property, and any other factors pertaining to a just and equitable award. (*Ibid.*)

In making a spousal support order, a trial court has broad discretion to fairly exercise the balancing process of section 4320, with the goal of accomplishing substantial justice for the parties in the case before it. (*Ciprari, supra,* 32 Cal.App.5th at p. 108.) In balancing the statutory factors, the trial court has discretion to determine the appropriate weight to accord to each. But the court must exercise its discretion within legal principles,

taking into consideration the applicable circumstances of the parties as set forth in section 4320, especially their reasonable needs and their financial abilities. (*Ibid.*; *In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 269 (*McLain*) [in awarding spousal support, the court must consider the mandatory guidelines of § 4320].) The court does not have discretion to ignore any relevant circumstance enumerated in the statute. The court must recognize and apply each applicable statutory factor in setting spousal support. (*Ciprari, supra,* 32 Cal.App.5th t p. 108.)

### (a) *Modification Based on Retroactive Application of the Unconscionability Finding*

Kim seeks modification based upon invalidation of the PMA. She argues the trial court erred in refusing to apply the spousal support award retroactively after it invalidated the PMA upon which the temporary award was based. The trial court refused to do so based upon its conclusion that the temporary award was based upon more than the PMA, namely, the use of the residence with no *Watts* payment. However, she asserts the trial court was incorrect because the temporary award referred to *child* support, not spousal support. Therefore, she contends, the PMA is the sole basis upon which the pendente lite spousal support award was made, and the invalidation of the PMA justifies revisiting pendente lite support.

### (i) *Factual Background*

The trial court stated it departed from the guideline amount because "1) The guideline would result in an order exceeding the marital standard of living and 2) The parties signed a premarital agreement limiting support." The court interpreted the PMA to adjust the baseline award of $6,000 per month upward after the 11th year of marriage, and awarded $6,983 per month retroactive to October 1, 2012.

### (ii) *Discussion*

Generally, courts will not modify child or spousal support unless there has been a material change of circumstances following the previous determination. (*Cryer, supra,* 198 Cal.App.4th at p. 1048.) "'[T]he reason for

the change of circumstances rule is to preclude relitigation of the same facts' and to bring finality to determinations concerning financial support." (*In re Marriage of Rosenfeld & Gross* (2014) 225 Cal.App.4th 478, 490 (*Rosenfeld & Gross*).) "'Without a changed circumstances rule, "'dissolution cases would have no finality and unhappy former spouses could bring repeated actions for modification with no burden of showing a justification to change the order. Litigants "'are entitled to attempt, with some degree of certainty, to reorder their finances and life style [*sic*] in reliance upon the finality of the decree.'" [Citation.] Absent a change of circumstances, a motion for modification is nothing more than an impermissible collateral attack on a prior final order.'"'" (*Rosenfeld & Gross, supra*, at p. 490.)

The burden of proof to establish changed circumstances sufficiently material to support an adjustment in support rests with the party seeking modification. (*Cryer, supra*, 198 Cal.App.4th at p. 1054.) "The ultimate determination of whether the individual facts of the case warrant modification of support is within the discretion of the trial court. [Citation.]" (*In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 556.) "[A]n abuse [of discretion] occurs when a court modifies a support order without substantial evidence of a material change of circumstances." (*In re Marriage of McCann* (1996) 41 Cal.App.4th 978, 983 (*McCann*).)

There are no rigid guidelines for evaluating whether circumstances have sufficiently changed to warrant a support modification. However, in evaluating a request for modification of an existing support order, the focus is generally on whether there has been "a reduction or increase in the supporting spouse's ability to pay and/or an increase or decrease in the supported [party's] needs." (*McCann, supra*, 41 Cal.App.4th at p. 982.) "Each case stands or falls on its own facts, but the overriding issue is whether a change has affected either party's financial status." (*In re Marriage of Laudeman* (2001) 92 Cal.App.4th 1009, 1015.)

An order modifying or terminating spousal support generally may be made retroactive only to the date of filing the OSC or notice of motion to modify or terminate. (§ 3653, subd. (a); *In re Marriage of Gruen* (2011) 191 Cal.App.4th 627, 638.) The question of retroactivity lies within the trial court's sound discretion, exercised generally regarding the supported party's

need and the supporting party's ability to pay during the period for which a retroactive modification is sought. (*Cheriton, supra,* 92 Cal.App.4th at pp. 312–313.)

Here, the trial court's conclusion that the temporary support order was not entirely based upon the PMA does not withstand scrutiny. The pendente lite order explicitly discusses how the limits of the PMA required it to adopt the PMA's figures as de facto child support. Even assuming the trial court was correct that other factors were at play in the fashioning of the pendente lite order, we cannot discern the extent to which they dictated the pendente lite award, and the matter must be remanded for a determination of pendente lite child support from the date of Kim's OSC.

### (b)     *Tax Ramifications*

Section 4320, subdivision (j) requires the trial court, in awarding support, to consider the tax consequences of its award. Here, other than claiming the trial court failed to specify the manner in which it considered the issue, Kim does not argue how such omission prejudiced her. She does not point to any evidence that the tax consequences of the court's spousal support award negatively affected her.

## FEE CROSS-APPEALS

Both Kim and Mark cross-appeal from the trial court's fee awards. Mark contends the court erred in (1) determining he was not the prevailing party and (2) apportioning 80 percent of Kim's fees to him. Kim contends that the trial court (1) failed to make the required finding under section 2030, subdivision (a)(2) whether Mark was able to pay the fees for both parties, and (2) mistakenly relied on *Alan S.* and the outdated versions of the applicable statutes upon which it was based.

## I.     FACTUAL BACKGROUND

A.     *Trial Proceedings Re Fees*

1.     *Fee Clause in PMA*

The PMA provided "the prevailing party, whether at trial or on appeal, shall be entitled, . . . to be reimbursed by the non-prevailing party for all

costs and expenses incurred thereby, including but not limited to reasonable attorneys' fees and costs for services rendered to the prevailing party."

### 2. *Hearing re Fees*

Mark and Kim both argued that they were the prevailing party under the PMA having obtained greater relief in the litigation, and both also sought fees as sanctions under section 271.

Kim sought total fees of $2,783,427.04, consisting of funds borrowed from her mother and stepfather, funds owed to her attorneys and accountants, and costs. Kim sought 100 percent of her fees and costs based on her need and Mark's ability to pay. She asserted Mark earned in excess of $10 million in 2014, had assets of $24 million and the Malibu residence was worth in excess of $15 million. Kim, on the other hand, asserted she only received $6,983 per month in spousal support.

In addition, Kim claimed she should be deemed the prevailing party (or alternatively, there was no prevailing party) based on her successful challenge to the spousal support clause of the PMA, and she sought section 271 sanctions based upon Mark's unreasonable custodial demands.

Mark pointed to Kim's conduct in, among other things, litigating the PMA (while deciding for months whether she would contest it), seeking excessive amounts for monthly rent (up to $50,000 per month to rent a home similar to the Malibu residence), and seeking $70,000 in spousal support, and $25,000 per month in child support.

### B. *Trial Court Ruling*

The trial court issued a statement of intended decision on March 17, 2017.[27]

### 1. *Prevailing Party*

Relying on *De La Cuesta v. Benham* (2011) 193 Cal.App.4th 1287, the court found there was no prevailing party, concluding Mark prevailed on the overall validity of the PMA, while Kim succeeded in invalidating the spousal

---

[27] As amended and corrected May 10, 2017, May 30, 2017, and August 8, 2017.

support limitation. The court noted that the PMA had two principal effects: it eliminated community property, and severely limited Mark's spousal support obligation in amount and duration. The court found "clear wins" for each party on the two issues litigated (overall validity and spousal support) but rejected each parties' contention that their "win" had a substantially greater economic impact. "[A] final determination of the true value of either side's victory is not possible on the evidence received by the court."

First, the court could not determine, due to the vacillating nature of the evidence of Mark's assets, how much property he had at the start of the marriage. Mark came into the marriage with substantial separate property assets, leaving the question of what portion of his net worth would have been separate even without the PMA. "No evidence received by the court allows such a calculation." "Thus, the value of [Mark's] successful defense of the PMA cannot be credited with any specific dollar sum." On the other hand, Kim claimed her spousal support order could be valued at $15 million, but given future contingencies (modification, termination due to remarriage) and Kim's failure to consider taxation, "no specific dollar sum can be assigned to this win."

### 2. *Section 271 Fees*

Noting that "sanctions are reserved for *reprehensible* conduct," the court found neither party was entitled to fees under section 271.

Kim's request for section 271 fees had been primarily based on custody issues and focused on Mark's unsuccessful requests regarding physical and legal custody. The trial court found the "fact [Mark's] request was not granted is no basis for sanctions. [Mark] clearly and honestly believed that granting him such authority was in the best interest of the children and there was substantial evidence that could support that opinion."

Mark's request for section 271 sanctions was based on a longer list of complaints: Mark objected to the contrasting settlement proposals of each side, namely Kim's request for a lump sum payment that was infeasible after the PMA was upheld, but the trial court found "there is nothing inappropriate about seeking a goal the court cannot reach by making compromises in areas where one's trial case is stronger." Kim's failure to

agree to a "nesting" timeshare and her OSCs and RFOs were "simply reflections of a different but reasonable point of view." Kim's delay in deciding whether to challenge the PMA similarly could not support sanctions. "[Mark] offers no evidence that these litigation decisions were made for the purpose of delay or any reason other than counsel's careful weighing of the pluses and minuses of the decision for his client." With respect to disputes over Kim's purchase of household objects and the time it took to litigate a suitable replacement rental for Kim, they were likewise not a basis for sanctions as "[e]ach party had a different but reasonable plausible contention on [the issues]."

In sum, the trial court observed that "[t]his case was intensively and exhaustively litigated by each side. No witness examination, nor especially any cross examination, was pro forma. It cannot be said that at trial [Kim] consumed substantially more time than [Mark]. While the court did not keep track of the times used by either party for examination or argument during trial, it seemed that the time each used was either equal or was slightly higher for [Mark]. This case could have been tried more quickly, more issues could have been settled but if parties choose to have full out litigation with detailed examination of witnesses that serve a point rather than just spending time, that right should not be taken away from them by a draconian fee order. Zeal and vigor in the representation of clients are commendable. *Marriage of Davenport* (2011) 194 Cal.App.4th 1507[.] *Davenport* condemned 'attack dog' 'scorched earth' litigation but that was not the case here. If only [Kim] had been litigating in this full on, intensive fashion the court might be more inclined to question the basis of this style but both parties were similar in their litigation approach."

3. *Fees Under Section 2030*

The court considered the factors required by section 2030.

(a) <u>Ability to Pay</u>. The court found Kim had a need for assistance with her attorney fees but she also had some ability to pay them herself. After considering income from employment after receiving child and spousal support, the court calculated she would have yearly net spendable income (after tax payments) in the low $40,000 range.

59

Although the court recognized that *In re Marriage of Hatch* (1985) 169 Cal.App.3d 1213 (*Hatch*), suggested that support awards should generally not be considered in determining ability to pay, the court concluded *Hatch* dealt with orders made at the pendente lite stage of the case and focused on fees needed to maintain the litigation. In contrast, *Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238 (*Alan S.*), held that the purpose of section 2030 is "not to redistribute wealth from the greater income party to the lesser but rather to equitably apportion the burden of litigation between the parties. The court must make a nuanced consideration of the needs of each party including expenses which perforce requires recognition of the equalizing effect of the payment of support by one party and the receipt of that support by the other. [¶] The court finds the *Alan S.* approach more persuasive. Each party is paying their expenses from the same pot of money, the gross income of [Mark]." Further, the court observed that "While it is true as stated in *Hatch* that the payee is using the support paid to meet living expenses, it is no less true that the payor is using what is left over to meet similar living expenses. This is particularly true where, as here, the parties have equal time share with the children."

Relying on *Alan S.,* the court used the income findings made in the judgment and also considered direct support payments to find Mark would have approximately 70 percent of net spendable income, while Kim would have 30 percent. Although Kim requested that the court rely on Mark's 2014 and 2015 income tax returns, the court instead found Mark's income and expense declaration from the period ending September 2016 "suggest[ed] a dramatic future reduction in income, a current higher monthly gross income than was found by the court but a net spendable lower than that of [Kim] after considering all expenses." The court also considered future reduction in Mark's income, payments to the minor children, and expenses for the adult children.

The court found a 70/30 division of net spendable income to be a starting point for consideration of allotment of attorney fees. Adjustments would be made based on the assets available to each party, access to funds, reasonable expenses and the reasonableness of the fees incurred.

(b)     Access to Funds for Fees.  Kim's fees had been paid in part with loans from her mother and stepfather; such loans totaled $458,024.  Under *In re Marriage of Smith* (2015) 242 Cal.App.4th 529, such loans were to be treated as gifts, and the court considered them funds accessible to Kim.

(c)     Reasonableness of Fees.  The court observed that the case was an exceptionally long trial of 57 days that was "intensively and exhaustively litigated by each side."  Fees on both sides were approximately equal.  The court noted that during trial, Kim's counsel was often late and extended recesses beyond the time allotted.  Mark asserted $30,000 in fees were occasioned by these delays, and the court stated it would adjust the fees accordingly.

To date, Mark had advanced $778,383 on account of Kim's fees and $145,000 for accounting services.  Mark also advanced the sum of $194,545 for the privately compensated judge and $106,861 for court reporters.  The court declined to reallocate the judge and court reporter fees, but stated it would take them into account.

The court found $3.6 million per side in fees, with $300,000 for court fees, totaling $7.5 million.  Initially, a 70/30 assessment (later revised to 80/20) would assign to Mark $5.25 million, less $4.82 million for fees advanced to date to Kim and judge and court reporter costs, leaving a balance of $480,000; such balance would "be the starting point for a further contribution of fees to [Kim]."

The court found the "starting point" "must be adjusted taking into account the vastly greater value of assets owned by [Mark].  Whether the court uses the highly questionable claim or $11.5 million dollars of net worth, [Kim's] speculation of $40 million dollars or the court's somewhat tentative finding of the range of $20 million dollars, [Mark's] net worth dwarfs [Kim's] which is in the range of $0.00 dollars.  This requires a substantial upward adjustment of the fee order."

The court ordered an additional contribution from Mark towards Kim's fees and costs of $920,000.

61

## II.    DISCUSSION

A.    *Prevailing Party*

Mark argues he prevailed because overwhelming evidence rebutted Kim's claim of incompetence, ignorance and duress.  Further, Kim's request for additional spousal support under revised section 1612 cannot be balanced against Mark's victory on the overall validity of the PMA because this was the only contract issue presented.  Finally, he asserts that in the context of a PMA, the "prevailing party" question is not just about money; here, the parties would not have married without a PMA and lived pursuant to the PMA's terms during their marriage.  Kim does not dispute the trial court's finding that there was no prevailing party for purposes of attorney fees.

Under Civil Code section 1717, parties to a contract may provide that the prevailing party is entitled to attorney fees.  (Civ. Code, § 1717; *DisputeSuite.com LLC v. Scoreinc.com* (2017) 2 Cal.5th 968, 973.)  The "prevailing" party is the party who recovered greater relief in the action on the contract.  (Civ. Code, §1717, subd. (b)(1).)  A trial court determines the prevailing party upon final resolution of the contract claims and by making a comparison of the extent to which each party has succeeded or failed in its contentions.  (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876 (*Hsu*).)

"If neither party achieves a complete victory on all the contract claims, it is within the discretion of the trial court to determine which party prevailed on the contract or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees."  (*Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109 (*Scott Co.*) [trial court did not abuse its discretion in determining plaintiff was the prevailing party even though it received less than 25 percent of the damages it sought].)  In exercising that discretion, our high court has counseled, "the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources."  (*Hsu, supra*, 9 Cal.4th at p. 876.)  If neither party achieves a complete victory on the contract claims, the trial court has discretion to determine the prevailing party.  (*Scott Co., supra*, 20 Cal.4th at p. 1109; *De La Cuesta v. Benham, supra*, 193 Cal.App.4th at p. 1294.)  In deciding this question, the court

62

compares the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and other sources. (*Hsu, supra*, 9 Cal.4th at p. 876; *Marina Pacifica Homeowners Assn. v. Southern California Financial Corp.* (2018) 20 Cal.App.5th 191, 204.)

We find no abuse of discretion in the trial court's evaluation of the parties' relative success in the proceedings. Although Mark was successful in preserving the PMA's elimination of any community property, the fluctuating evidence of his net worth (from which a potential community property interest could be derived) left the trial court without the tools to calculate the monetary value of this success. On the other hand, Kim's success in voiding the support provisions was far easier to value. Although the trial court rejected Kim's estimate of this value due to contingencies that had not yet occurred (and might never occur), it concluded that her victory had sufficient value to offset Mark's victory.

In addition, we reject Mark's contention that because the parties "lived under" the PMA's terms during their marriage and he spent his separate property on Kim, this non-monetary aspect of the parties' conduct under the contract should accord him prevailing party status. The PMA operated like a will and did not become operative until the parties' dissolution proceedings commenced and Kim challenged its validity. Given that both parties partially prevailed on their assertions, the trial court acted within its powers in concluding even a variance in the monetary value did not justify awarding one party or the other prevailing status.

### B. *Section 271*[28]

Mark argues that Kim's "gonzo" approach to the litigation justified an award of fees to him because otherwise, this "litigation run amok" "will never end" until Kim is no longer subsidized by Mark. He points to her conduct in

---

[28] As Kim points out, Mark's brief is not entirely clear whether he is arguing the court erred in failing to apply section 271, or whether he contends it merely abused its discretion in allocating 80 percent of the fees to him. In any event, we evaluate the trial court's section 271 ruling.

making unreasonable demands for primary custody, challenging the PMA with a weak argument, seeking an unreasonable amount for a replacement residence, challenging the support provision and seeking excessive spousal support.

Pursuant to section 271, a trial court may base an attorney fees and costs award "on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys." (§ 271; *Parker v. Harbert* (2012) 212 Cal.App.4th 1172, 1177; *In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1100.) Section 271 imposes a minimum level of professionalism and cooperation to effect the policy goal favoring settlement of family law litigation and a reduction of the attendant costs. (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1537.)

Section 271 is not tied to need, but is a penalty for bad conduct. With section 271, a lesser showing of culpable conduct is needed than under other sanctions statutes. (*Burkle v. Burkle* (2006) 144 Cal.App.4th 387, 399; *In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1318 [section 271 "does not require that the sanctioned conduct be frivolous or taken solely for the purpose of delay"].) The purpose behind section 271 is to promote settlement and encourage litigant cooperation; therefore, no showing of separate injury is required. (*Id.* at p. 1317.)

Although there need not be a direct correlation between section 271 sanctions and expenses incurred due to the sanctionable conduct, such sanctions must be "tethered to attorney fees and costs." In other words, "'sanctions available under the statute are limited to "attorney fees and costs,"'" and do not, for example, include travel expenses necessarily incurred to attend court hearings or vacation time used for relief from work obligations. (See *Menezes v. McDaniel* (2019) 44 Cal.App.5th 340, 350–351.)

While "need" is irrelevant, the court must take into consideration "all evidence concerning the parties' incomes, assets, and liabilities." And in no event may the amount of the sanction impose "an unreasonable financial burden" against the sanctioned party. (§ 271, subd. (a); *In re Marriage of Fong* (2011) 193 Cal.App.4th 278, 291; *In re Marriage of Pearson* (2018) 21

64

Cal.App.5th 218, 234.) Unless sanctions are scaled, they might discourage the economically weaker party from pursuing actions. (*In re Marriage of Norton* (1988) 206 Cal.App.3d 53, 60.)

The award of section 271 sanctions is committed to the trial court's broad discretion. An "unreasonable financial burden" cap is the only limit on this discretion. The trial court's ruling can be set aside "only if, considering all of the evidence viewed most favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably [have made] the order." (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1225–1226; *Menezes v. McDaniel, supra,* 44 Cal.App.5th at p. 347.) Trial courts have no discretion, however, to assess section 271 sanctions without evidence of the statutory factual predicate, namely conduct that frustrated the promotion of settlement and the reduction of litigation costs. (*In re Marriage of Lucio* (2008) 161 Cal.App.4th 1068, 1083.)

Applying these standards here, the trial court concluded that the parties' conduct was based upon rational motivations. The court found Mark's custody requests were based on what Mark "clearly and honestly" believed was in the best interests of the children, while Mark offered no evidence Kim's litigation decisions were made for the purpose of delay or any reason other than counsel's careful weighing of options for Kim. We cannot say these conclusions are unreasonable, and there was no error in denying section 271 sanctions.

C.     *Section 2030 Fee Calculation*

Mark asserts that the trial court's math is "incomprehensible" and it abused its discretion in appropriating 80 percent of Kim's fees to him. In response, Kim asserts that Mark has not shown the trial court's findings are not supported by substantial evidence, and in her cross-appeal asserts the trial court erred in failing to make the required finding under section 2030, subdivision (a)(2) that Mark had the ability to pay the fees of both parties, and in improperly relying on *Alan S.* to "nuance down" Mark's obligations.

1.  *Sections 2030 and 2032*

Under sections 2030 and 2032, the trial court may make a need-based award of attorney fees and costs where the making of the award and its amount are just and reasonable given the relative circumstances of the parties.  (§§ 2030, 2032, subd. (a).)[29]  The court's decision on a request for section 2030 fees must be based upon (1) an assessment of the parties' respective income and needs, (2) whether there is a disparity in their respective access to funds to retain legal counsel, and (3) whether one party is able to pay for legal representation of both parties.  (§ 2030, subds. (a)(1), (2); *In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 662 (*Sorge*) [statutory

[29]     Section 2030, subdivision (a) provides in relevant part that "[i]n a proceeding for dissolution of marriage, . . . the court shall ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party, . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding.  [¶]  (2)  Whether one party shall be ordered to pay attorney's fees and costs for another party, and what amount shall be paid, shall be determined based upon, (A) the respective incomes and needs of the parties, and (B) any factors affecting the parties' respective abilities to pay."

Section 2032 provides:  "(a)  The court may make an award of attorney's fees and costs under Section 2030 or 2031 where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties.  [¶]  (b)  In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320.  The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested.  Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances."

framework provides court with discretion in fashioning attorney fee awards].)
"'An award of spousal support is a determination to be made by the trial court in each case before it, based upon the facts and equities of that case, after weighing each of the circumstances and applicable statutory guidelines. [Citation.]'" (*McLain, supra,* 7 Cal.App.5th at p. 269.)

Section 2032 requires the court to consider the factors set forth in section 4320, which include (1) "[t]he extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage" and (2) "[t]he needs of each party based on the standard of living established during the marriage" (§ 4320, subds. (a) and (d)).  The marital standard of living is "a general description of the station in life the parties had achieved by the date of separation," rather than a "mathematical standard." (*In re Marriage of Smith, supra,* 225 Cal.App.3d at p. 491.)  The trial court possesses broad discretion to fairly exercise the weighing process of section 4320, with the goal of achieving substantial justice for the parties. (*McLain, supra,* 7 Cal.App.5th at p. 269.)

As explained in *In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, the 2004 amendments to section 2030 compel the court to order fees, and the 2010 amendments made section 4320 findings mandatory.[30]  (*Id.* at pp. 1049–1051.)  "The textual changes made by the 2004 and 2010 legislation demonstrate that the discretionary authority granted to trial courts is not as broad as it once was and, currently, trial courts must comply with certain

---

[30]     The version of section 2030 enacted in 1993 stated the trial court "may . . . order" attorney fees in certain circumstances.  (Stats. 1993, ch. 219, § 106.1, pp. 1607–1608.)  The 2004 amendment deleted the word "may" and inserted text that used the word "shall" four times.  (Stats. 2004, ch. 472, § 1, p. 3057.)  The 2010 amendment modified section 2030 to include text stating "the court shall make findings" and stating "the court shall make an order awarding attorney's fees and costs" if the findings demonstrated certain conditions.  (Stats. 2010, ch. 352, § 4, p. 1819.)  (*Morton, supra,* 27 Cal.App.5th at p. 1049.)

mandatory provisions." (*Id.* at p. 1049.) A showing of prejudicial error flowing from the failure to make findings is required. (*Id.* at p. 1051.)[31]

In *Alan S., supra,* 172 Cal.App.4th 238, decided before the 2010 amendments, the court observed that "[r]eading section 2032 together with section 4320, one cannot escape the idea that a . . . fee award should be the product of a nuanced process in which the trial court should try to get the 'big picture' of the case, i.e., 'the relative circumstances of the respective parties' as the statute puts it. (§ 2032, subd. (a).) Conversely, determination of [an] attorney fee order is definitely not a truncated process where the trial court simply (a) ascertains which party has the higher nominal income relative to the other, and then (b) massages the fee request of the lesser-income party into some manageable amount that feels like it will pass an abuse of discretion test." (*Id.* at p. 254.) *Alan S.* concluded "the purpose of section 2030 is *not* the redistribution of money from the greater income party to the lesser income party. Its purpose is *parity*: a fair hearing with two sides equally represented. The idea is that both sides should have the opportunity to retain counsel, not just (as is usually the case) only the party with greater financial strength." (*Id.* at p. 251.)

Section 2032 makes clear that "[t]he fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances." (§ 2032, subd. (b).) Notwithstanding the parties' relative economic circumstances, an award under section 2030 et seq. is properly denied if a case has been overlitigated or if the fees otherwise were not "reasonably necessary." (§ 2030, subd. (a)(1); *In re Marriage of*

---

[31] In *In Marriage of Morton, supra,* 27 Cal.App.5th 1025, the court observed that the 2010 amendments to section 2030 had placed limitations on trial court discretion with regard to fees, and it is no longer accurate to refer to a trial court's "broad discretion" when describing a trial court's responsibilities under section 2030 as currently in effect. (*Id.* at pp. 1048–1049.)

*Keech* (1999) 75 Cal.App.4th 860, 870–871.) Indeed, it is an abuse of discretion to award fees "without making any inquiry into the reasonableness of those fees." (*Id.* at p. 870; *Ciprari, supra,* 32 Cal.App.5th at pp. 111–112.)

We review a trial court's award of attorney fees (§§ 2030, 2032) and sanctions (§ 271) for abuse of discretion. (*In re Marriage of Schleich* (2017) 8 Cal.App.5th 267, 276.) "In exercising its discretion the trial court must follow established legal principles and base its findings on substantial evidence." (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 47.) "'To the extent that a trial court's exercise of discretion is based on the facts of the case, it will be upheld "as long as its determination is within the range of the evidence presented."'" (*In re Marriage of Blazer, supra,* 176 Cal.App.4th at p. 1443.)

### 2.    *Mark's Contentions:  Wrong Numbers*

Mark contends the trial court's arithmetic was in error because $5,250,000 minus $4,820,000 is $430,000, not $480,000. Mark is correct. The fee award is corrected to subtract $50,000 from $920,000 for a balance due of $870,000. (*Nunn v. JPMorgan Chase Bank, N.A.* (2021) 64 Cal.App.5th 346, 361 [courts have inherent power to correct clerical errors].)

### 3.  *Mark's Contentions:  Error in Awarding Kim 80 Percent of Her Fees*

To the extent Mark argues that the trial court erred in awarding Kim 80 percent of her fees, we find no error. Mark asserts that "leveling the playing field" should not translate into a "dollar-for-dollar disgorgement of separate property funds from the 'in' spouse to the 'out' spouse," and the trial court erred in treating the case like ordinary civil litigation.

However, the court is permitted to consider the parties' relative circumstances in fashioning a fee award. Section 2032 authorizes a need-based fee award even though the applicant spouse might be able to pay his or her attorney without financial assistance because the court must consider the parties' relative circumstances. (§ 2032, subd. (b).) Indeed, the other party's superior ability to pay may itself make a fees and costs award "just and reasonable." (*Sorge, supra*, 202 Cal.App.4th 660–661.) In *Sorge,* although

the wife had abundant financial assets of her own, the court found no abuse of discretion in awarding her $260,000 in total fees given the "huge disparity" in parties' respective assets. In *In re Marriage of O'Connor* (1997) 59 Cal.App.4th 877, 884, there was no abuse of discretion in awarding husband a total of $700,000 fees even where husband had $2 million in assets and wife had $40 million in assets.

Here, Mark erroneously equates the court's ability to consider the parties' relative incomes pursuant to section 2032 with a prohibited transfer of wealth in the guise of attorney fees under *Alan S.* Mark succeeded in eliminating Kim's community property interest entirely, leaving Mark with all the funds he had accumulated during marriage intact. As a result, his net worth dwarfed Kim's net worth—Kim left the marriage with essentially no assets. On this basis, the trial court did not abuse its discretion in awarding Kim 80 percent of her fees.

> 4. *Kim's Contentions: Mark Could Pay 100 Percent and the Trial Court Erred in Failing to Make Section 2030 Findings in This Regard*

Kim argues that the trial failed to find whether Mark was able to pay the fees of both parties pursuant to section 2030, subdivision (a)(2), and such failure was prejudicial because Mark was able to pay such fees. Instead, she contends the trial court erroneously relied on her net spendable income after taxes, although Kim has a negative net worth. Mark counters that *Morton* did not overrule *Alan S.,* and the trial court properly relied on it in setting fees.

Here, the court did not expressly find that Mark had the ability to pay both parties' fees. However, such a finding can be implied from the court's statements regarding Mark's net worth, Kim's lack of assets, her other sources of funds to pay fees, and the parties' net relative share of Mark's income. (*In re Marriage of Schleich, supra,* 8 Cal.App.5th at pp. 292–294 [ability to pay finding implied from trial court's ruling].)

In any event, there is no prejudice to Kim from the lack of an express finding. Given that the record discloses that Mark had the ability to pay both parties' fees, the court's departure from a 100 percent cost award

70

demonstrates that the result in this case would not have been different had the court made an express finding.

     5.     *Kim's Contention:  Erroneous Reliance on Alan S.*

Further, Kim argues the trial court's reliance on *Alan S.,* and the outdated statutes on which it relies, was error.  She asserts that *Morton* recognized previously discretionary duties were now mandatory, and "[b]y using the principles of *Alan S.* to provide 'nuance' to its mandated consideration of the parties' respective needs and ability to pay, the trial court gave Mark an undeserved break" and did so by concluding Kim could divert some of her support money to pay unreimbursed fees.

As explained in *In re Marriage of Morton, supra,* 27 Cal.App.5th 1025, the 2004 amendments to section 2030 to require the court to order fees, and the 2010 amendments required the court to make findings.  (*Id.* at pp. 1049–1051.)  "The textual changes made by the 2004 and 2010 legislation demonstrate that the discretionary authority granted to trial courts is not as broad as it once was and, currently, trial courts must comply with certain mandatory provisions."  (*Id.* at p. 1049.)  A showing of prejudicial error flowing from the failure to make findings is required.  (*Id.* at p. 1051.)

However, nothing in the revisions to section 2030 affected the trial court's ability to evaluate the parties' respective needs when awarding fees, nor did *Morton* overrule *Alan S.*  Rather, the amendments limited the discretion to be applied regarding whether the parties' needs could be evaluated to determine fees.  On the other hand, *Alan S.* prohibits a mere wealth transfer between the wealthier spouse in the guise of a fee award and requires the court to adopt a balanced approached to its analysis—which the court did here.  Kim therefore misreads the trial court's reliance on *Alan S.*

Finally, as we have discussed above, the trial court's fee division of 80 percent to 20 percent was within its discretion and does not represent unlawful "nuance."  Kim had some assets with which to pay fees, and given the extent of the litigation, the court ascribed 20 percent of her fees to her.

71

## DISPOSITION

The judgment of the superior court is reversed with respect to the spousal support award, and remanded for a determination of pendente lite spousal support from the date of Kim's OSC.  The attorney fee award is corrected to reflect that Mark must pay Kim $870,000.  In all other respects, the judgment is affirmed.  The parties are to bear their own costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**


                                        WILLHITE, Acting P. J.

We concur:



COLLINS, J.                    CURREY, J.


72